Opinion issued September
30, 2009

 

 

 



 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-07-01074-CR

NO. 01-07-01075-CR

NO. 01-07-01076-CR

NO. 01-07-01077-CR

NO. 01-07-01078-CR

NO. 01-07-01079-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



ANDREAS PETER STARZ, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 208th District Court

Harris County, Texas

Trial Court Cause Nos. 1079811, 1079812, 1079813,

1079814, 1084538, 1084539

 

 



O P I N I O N

          The State charged Andreas
Starz with committing two separate felony offenses of aggravated sexual
assault, three separate felony offenses of sexual assault of a child, and one
felony offense of engaging in an improper relationship with his student.[1] 
Starz pleaded guilty to all six offenses after agreeing to a plea bargain with
the State.  As recommended by the State, the trial court assessed punishment at
six years’ confinement for each of the six offenses, to run concurrently. 
Starz moved for a new trial, alleging that his trial counsel provided
constitutionally ineffective assistance in connection with Starz’s guilty plea. 
After a five- day hearing, the trial court denied the motion.  Starz appeals,
contending that the trial court erred in denying his ineffective assistance
claim, and that he was prejudiced by the trial court’s failure to admit
evidence at the motion for new trial hearing.  After reviewing all of the
evidence the trial court heard, we affirm.

Background

In August 2006, two girls, P.M. and
K.M., each fourteen at the time of her outcry,[2]
alleged that their seventh-grade history teacher, Andreas Starz, sexually
assaulted them in May 2006.  Police interviewed both girls at the Children’s Assessment Center in Houston.  P.M. stated that Starz took her to his girlfriend’s apartment on
May 29, 2006, Memorial Day, and had sexual intercourse with her on both the
couch and the bed.  Starz claimed to have asked P.M. to babysit his son that
morning while he participated in a group bicycle ride, but instead, he took his
son to his ex-wife’s house, and P.M. did not need to babysit.  K.M. stated that
Starz assaulted her by touching her vagina while watching a video during
class.  K.M. also alleged that in two other separate incidents, Starz made K.M.
perform oral sex on him and they engaged in sexual intercourse while at K.M.’s
apartment.

The State charged Starz with six
offenses:  two felony offenses of aggravated sexual assault, three felony
offenses of sexual assault of a child, and one felony offense of engaging in an
improper relationship with a student.  After his arrest, Starz’s family hired
L.T. Bradt to defend him.  Bradt met with Starz in jail and described his
credentials.  Starz testified that Bradt spent most of their first hour-long
meeting talking about himself and his legal experience.  He expressed confidence
that Starz could win his case, and Starz’s parents testified that Bradt told
them Starz had a ninety percent chance of winning his case.  They also
testified that Bradt told them he cracked the case of misconduct in the Harris County crime lab.  In contrast, Bradt testified that he told Starz that he had
represented sexual assault defendants in the past, both successfully and
unsuccessfully, and that he believed Starz had a good chance of winning, but
did not express that chance in terms of a percentage.  He testified that he
mentioned his role in the crime lab case to explain that he had a controversial
relationship with the Harris County District Attorney’s office, which might limit
his ability to negotiate a favorable plea bargain.  In fact, Bradt told the
Starzes that if they wanted a plea bargain, he might not be the best lawyer to
handle Starz’s case because of this unfavorable relationship.

Starz’s parents paid Bradt’s $100,000
fee in two installments of $50,000 each.  Bradt indicated at the beginning of
the representation that he believed Starz was not guilty and would win his
case.  Bradt’s contract for representation, however, states that he does not
guarantee any outcome or the success of the defense.

In addition to the $100,000 fee,
Bradt required that the Starzes pay the cost of engaging private investigators
and certain experts that he alleged would be necessary to Starz’s defense. 
Bradt engaged Kim Hart, the director of the National Child Abuse Defense and Resource Center, as a trial consultant; Starz’s parents paid her $30,000.  Bradt testified
that Hart helped put him in touch with experts, reviewed transcripts of P.M.
and K.M.’s statements, reviewed telephone records, and participated in
discussions with one of the expert witnesses.  Bradt, with Hart’s help, engaged
Dr. Stephen Guertin to review P.M. and K.M.’s medical records; review of the
records showed that there was no clear evidence of trauma, which frequently
occurs in cases where the victim’s outcry is delayed.  Bradt also testified
that he consulted with Dr. Philip Esplin, who he hoped could testify as to P.M.
and K.M.’s mental states and the psychological dynamics of their age group. 
After speaking with Dr. Esplin and reviewing P.M. and K.M.’s statements, Bradt
testified that he determined Esplin would not be a helpful witness but instead
might harm Starz’s case.  Starz testified that sometime before the second trial
setting, he asked Bradt about the cost of having experts appear for trial. 
Bradt told him that with fees and paying the experts’ expenses, it could cost
as much as $60,000.

At the early stages of trial
preparation, the State did not order any DNA tests because both P.M. and K.M. had
made delayed outcries.  Shortly before the second trial setting, however, the
State ordered DNA testing on items from the apartment where P.M. was assaulted. 
Starz and Bradt were made aware of the testing.  The DNA results had not
returned when Starz pleaded guilty.  The results later linked P.M. to the
materials tested from Starz’s girlfriend’s apartment.  

Bradt hired J.J. Gradoni and Carey
Wellmaker to serve as private investigators for the case.  Bradt testified that
he tries to avoid directly talking to witnesses and instead Bradt hires investigators
to do so.  In this case, Bradt requested that Gradoni and Wellmaker attempt to
contact the witnesses whom Starz identified as potentially helpful.  During one
meeting with Starz, Bradt brought a school yearbook and had Starz go through
the pages and identify potential witnesses.  Starz contends he suggested a list
of approximately sixty-six witnesses whom he believed would be helpful.  Since
K.M. alleged that one of her assaults occurred during class, many of the
witnesses on this list were other students present in Starz’s classroom at the
time of the assault.  Starz also identified other teachers, whom he claimed
could verify difficulties that he had with P.M. and K.M. in the past, and
friends of P.M. and K.M. who could verify that they used drugs and engaged in
promiscuous behavior.  Bradt subpoenaed the school in order to obtain contact
information for many of the students in Starz’s class.  Gradoni and Wellmaker spoke
to approximately five students, some of whom were in Starz’s class, and others
who knew P.M. and K.M.  Bradt testified that Gradoni and Wellmaker had trouble
finding some students because their contact information was incorrect, and they
were unable to speak to other students because their parents refused to
consent.  All of the students with whom Gradoni and Wellmaker spoke, however,
said that they did not observe Starz sexually assaulting K.M. during class. 
Some of the students also stated negative impressions of P.M.’s character.  Bradt
testified that neither he nor his investigators interviewed P.M. and K.M.
because the prosecutor made it abundantly clear on several occasions that P.M.,
K.M., and their families were not willing to talk to the defense.  The
investigators also spoke with the principal of the school, who was very
reluctant to share information.

Bradt also asked Gradoni and
Wellmaker to contact Amanda Williamson, Starz’s girlfriend at whose apartment
P.M. alleged that her assault occurred.  Gradoni and Wellmaker attempted to
contact Williamson by going to her apartment on at least two occasions. 
Williamson either was not home or did not answer the door, and the investigator
left a card and a note requesting that Williamson contact the investigators. 
Williamson never contacted the investigators, but she did speak with the State. 
Before the first trial setting, Bradt subpoenaed Williamson to testify at trial. 


Bradt spoke to one witness himself,
Renee Sides, Starz’s ex-wife.  Bradt sought information from Sides about the
location and appearance of Starz’s third tattoo because, according to the
offense reports, P.M. and K.M. were aware of the tattoo but could not describe
it.  Overall, Bradt believed that Sides would be a good character witness for
Starz, as she was supportive and did not believe that he had committed the
assaults.  Bradt, however, did not ask Sides about the events of Memorial Day,
when P.M. alleged Starz assaulted her.  At the motion for new trial hearing,
Sides testified that Starz had asked Sides if she would be able to watch their
son on Memorial Day so that Starz could participate in a bicycle ride that
morning.  Sides initially told Starz that she would be unable to do so because
she was going out of town for the weekend.  Sides testified that Starz then arranged
for P.M. to babysit their son that morning.  But Sides returned from her trip
early, and she notified Starz on Sunday night that she would be able to watch
their son.  Starz told her he was going to use the babysitter instead.  Then,
Sides testified that between 6:30 and 7:00 A.M. on Memorial Day, Starz called
and said that their son had changed his mind and wanted to go home, so Starz
took him to Sides’s house at about 7:00 A.M.  Starz returned to pick up their
son at 11:00 or 11:30 A.M.  According to Sides, her son was in the car with
Starz and P.M. shortly before the alleged assault occurred, and he could have
offered facts to corroborate Starz’s defense.  Sides testified, however, that
she did not go to the car when Starz dropped their son off or picked him up, so
she did not see if anyone was in the car at either time.  Ultimately, Sides
said that she was unable to offer any information about what Starz did between
the time he dropped off and picked up their son.

Judy Young, Sides’ mother and Starz’s
former mother-in-law, testified at the hearing that she saw Starz on May 26, 2006,
when one of the offenses against K.M. allegedly occurred.  Young testified that
she was keeping Starz’s son and his younger sister that morning and took them
to lunch around 11:00 A.M.  When they returned from lunch between 12:00 and
12:30 P.M., Starz was sleeping in his car in Young’s driveway.  Starz alleges
Young’s testimony could provide an alibi because K.M. alleged that Starz
assaulted her at her apartment at 11:15 or 11:30 A.M. on the same day.

Bradt testified that in September
2007, after investigating, he discussed the problems of the case with Starz. 
Bradt was most concerned that Starz was unable to offer any alibi witnesses for
the time that P.M. alleged that Starz assaulted her on Memorial Day, and that
phone records showed more than eight-hundred text messages and one-hundred-twenty
phone calls between him and P.M., the majority of which, according to Bradt,
were from Starz’s cell phone to P.M.’s cell phone.  Starz was unable to offer
an explanation for either of these problems.  Bradt testified that Starz also
admitted to lying to P.M.’s parents about taking her to babysit his son while
he went on his bike ride.  Thus, Bradt suggested that Starz consider pleading
guilty because the alleged assaults against P.M. were set to be tried first.  Bradt
denied telling Starz in September that he had an eighty-percent chance of being
convicted, but he admitted to telling Starz, in front of his father, that he
would likely die in prison.

          Starz testified that, in
early September, he still wanted a jury trial because he was innocent.  Starz
claimed that the expense of going to trial contributed to his decision to plead
guilty because he did not think that his family could afford to pay any
additional expenses.  Starz also testified that his family told him not to
worry about the expenses, and they did not disclose to him how much they were
spending on his defense.  He, however, knew that the family had made some
sacrifices in order to pay his defense bills.  Bradt told Starz that he
believed his chances of winning were not good, although he also said that he
would take the case to trial if necessary.  Bradt negotiated a plea offer with
the State.  Starz testified that, in preparation for the plea, Bradt gave him
examples of probation restrictions and lifetime restrictions for registered sex
offenders, but he did not explain to Starz the constitutional rights he was
waiving by pleading guilty.  Ultimately, the State offered three different
options based on the number of offenses to which Starz was willing to plead
guilty.  Starz opted to plead guilty to all six charges, each carrying a recommended
sentence of six years to be served concurrently, which was the shortest period
of incarceration offered by the State.  On the day of the plea, Bradt admitted giving
Starz plea papers to read over for himself, but Bradt said he was available to
answer Starz’s questions thereafter.

Starz entered his guilty plea in open
court after oral admonishments from the trial court.  The trial court asked
Starz if his attorney had answered all of his questions and if he was satisfied
with Bradt’s representation; Starz said yes.  He also told the trial court that
he was not coerced into pleading guilty.  Starz testified at the motion for new
trial hearing that he was aware that he could have hired a new attorney if he
was dissatisfied with Bradt’s representation.  Starz was aware that if he
pleaded guilty he would go to prison immediately—his mother brought tennis
shoes to court for Starz to wear to prison that day.

Discussion

Starz contends that the trial court
erred in overruling his motion for new trial because he received ineffective
assistance of counsel, and the court also erred in excluding evidence offered
during the motion for new trial hearing in Starz’s bill of review.

I. Ineffective Assistance of Counsel

Starz contends that he involuntarily
pleaded guilty because he received ineffective assistance of counsel.  A record
indicating that the trial court properly admonished the defendant presents a
prima facie showing that the guilty plea was made voluntarily and knowingly.  See
 Martinez v. State, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998); Arreola
v. State, 207 S.W.3d 387, 391 (Tex. App.—Houston [1st Dist] 2006, no pet.). 
If the record presents such a showing, the burden shifts to the defendant to
show that he entered the plea without understanding the consequences.  Edwards
v. State, 921 S.W.2d 477, 479 (Tex. App.—Houston [1st Dist.] 1996, no
pet.).  An accused who attests that he understands the nature of his guilty plea
and that it is voluntary has a heavy burden on appeal to show that his plea was
involuntary.  Id.; Dusenberry v. State, 915 S.W.2d 947, 949 (Tex.
App.—Houston [1st Dist.] 1996, pet. ref’d).  The defendant’s uncorroborated
testimony that he was misinformed by counsel is not sufficient to show that his
plea was involuntary.  Fimberg v. State, 922 S.W.2d 205, 208 (Tex.
App.—Houston [1st Dist.] 1996, pet. ref’d).

Starz entered guilty pleas on all six
offenses before the trial court on the record.  The trial court asked Starz if
he was satisfied with Bradt’s representation and if Bradt had answered all of
his questions; Starz said yes.  The trial court then admonished Starz as to his
absolute right to a jury trial, and asked him if he was pleading guilty because
he was guilty and for no other reason, and if he had been coerced into pleading
guilty; Starz answered that he was pleading guilty because he was guilty and
had not been coerced.  The trial court admonished him of the full range of
punishment and that the State’s sentencing recommendation is not binding on the
trial court.  Starz acknowledged that the plea agreement recommended six years’
confinement and lifetime registration as a sex offender.  

These admonishments satisfy the
requirements of the Texas Code of Criminal Procedure.  Tex. Code Crim. Proc. Ann. art. 26.13 (Vernon 2009).  During
the motion for new trial hearing, Starz testified that he knew he could have
replaced Bradt as his lawyer at any time had he been dissatisfied with Bradt’s
performance, but it “never crossed [his] mind” to do so.  We conclude that the
oral waivers and admonishments in the record constitute a prima facie showing
that Starz made his guilty plea knowingly and voluntarily.  See Labib v.
State, 239 S.W.3d 322, 332 (Tex. App.—Houston [1st Dist.] 2007, no pet.). 
Starz, therefore, has the burden of showing that he involuntarily entered his
plea due to Bradt’s ineffective assistance.  Id.

A guilty plea is not voluntary if
made as a result of ineffective assistance of counsel.  Ex parte Burns,
601 S.W.2d 370, 372 (Tex. Crim. App. 1980).  To prevail on a claim of
ineffective assistance of counsel, the defendant must show that (1) his
counsel’s performance was deficient and (2) a reasonable probability exists
that the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).  The first prong of Strickland
requires the defendant to show that counsel’s performance fell below an
objective standard of reasonableness.  Thompson v. State, 9 S.W.3d 808,
812 (Tex. Crim. App. 1999).  Thus, the defendant must prove objectively, by a preponderance
of the evidence, that his counsel’s representation fell below professional
standards.  Mitchell v. State, 68 S.W.3d 640, 642 (Tex. Crim. App.
2002).  The second prong requires the defendant to show a reasonable
probability that, but for counsel’s unprofessional errors, the result of the
proceeding would have been different.  See Strickland,
466 U.S. at 694, 104 S. Ct. at 2068; see also Thompson, 9 S.W.3d at
812.  In reviewing counsel’s performance, we look to the totality of the
representation to determine the effectiveness of counsel, indulging a strong
presumption that the attorney’s performance falls within the wide range of
reasonable professional assistance or trial strategy.  Thompson, 9
S.W.3d at 813.  Furthermore, a claim of ineffective assistance must be firmly
supported in the record.  Id. (citing McFarland v. State, 928
S.W.2d 482, 500 (Tex. Crim. App. 1996), overruled on other grounds by Mosley
v. State, 983 S.W.2d 249 (Tex. Crim. App. 1998)).

In the context of a claim that the
defendant involuntarily pleaded guilty, the defendant must show that (1) his
counsel’s advice was outside the range of competency demanded of attorneys in criminal
cases, and (2) that, but for counsel’s erroneous advice, the defendant would
not have pleaded guilty and would instead have gone to trial.  Ex parte
Moody, 991 S.W.2d 856, 857–58 (Tex. Crim. App. 1999); Labib, 239
S.W.3d at 333.  The Texas Court of Criminal Appeals has held that, “the only required
duty of counsel under the most liberal construction when a plea of guilty is
entered is that counsel should ascertain if the plea is entered voluntarily and
knowingly.”  Butler v. State, 499 S.W.2d 136, 139 (Tex. Crim. App. 1973).  A guilty plea based on erroneous information conveyed by trial
counsel to the defendant is involuntary.  Labib, 239 S.W.2d at 333; Fimberg,
922 S.W.2d at 207.  

Starz presented his ineffective
assistance claim to the trial court in a motion for new trial.  After a
comprehensive five-day hearing, the trial court overruled Starz’s complaint by
denying the motion.  We therefore analyze the ineffective assistance of counsel
issue as a challenge to the denial of the motion for new trial.  Charles v.
State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004) (holding appropriate
standard of review for ineffective assistance claim brought forth in motion for
new trial is abuse of discretion).  In such circumstances, we review the trial
court’s application of the Strickland test through an abuse of
discretion standard.  Id.  Thus, we reverse only if the trial court’s
decision is arbitrary or unreasonable, viewing the evidence in the light most
favorable to the ruling.  Id.

          Starz contends that Bradt
rendered ineffective assistance because his performance was deficient in
numerous ways.  Specifically, Starz argues that Bradt failed to: (1) conduct an
adequate independent investigation of the facts, contact witnesses, and discover
exculpatory evidence; (2) prepare for trial; and (3) communicate information
critical to Starz’s decision to plead guilty.  We consider each of these points
under the two-prong Strickland analysis.

          A. Failure to
Investigate

Where a defendant challenges the
ineffectiveness of his counsel for failure to investigate the facts on a guilty
plea, counsel’s decision not to investigate must be directly assessed for
reasonableness in all the circumstances, applying a heavy measure of deference
to counsel’s judgments.  Ex parte Briggs, 187 S.W.3d 458, 467 (Tex.
Crim. App. 2005) (quoting Wiggins v. Smith, 539 U.S. 510, 521–22, 123 S. Ct. 2527, 2535 (2003)).  Counsel has a duty to make reasonable
investigations or to make a reasonable decision that makes particular
investigations unnecessary.  Id. at 466–67; McFarland, 928 S.W.2d
482, 501 (Tex. Crim. App. 1996) (quoting Strickland, 466 U.S. at 691,
104 S. Ct. at 2066).  In the plea context, a defendant must show a reasonable
probability that, but for counsel’s errors, he would not have pleaded guilty
and would have insisted on going to trial.  Briggs, 187 S.W.3d at 469
(quoting Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985)). 
This assessment depends largely on a prediction of whether the evidence would
likely have changed the outcome of a trial.  Id.  A defendant is
entitled to rely on counsel to make an independent investigation of the facts,
circumstances, pleadings and laws involved, and then to offer his informed
opinion as to what plea the defendant should enter.  Id. (quoting Von
Moltke v. Gillies, 332 U.S. 708, 721, 68 S. Ct. 316, 322 (1948)).

Starz’s central concern is that Bradt
failed to contact and interview witnesses.  In his brief, Starz argues that “if
trial counsel had contacted the witnesses, he would have uncovered numerous
discrepancies in the State’s case, which would have advanced Starz’s position
at trial.”  To obtain relief on an ineffective assistance claim based on
uncalled witnesses, Starz must show that witnesses were available to testify
and that their testimony would have been of some benefit to the defense.  Ex
parte White, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004); see also Pinkston
v. State, 744 S.W.2d 329, 332 (Tex. App.—Houston [1st Dist.] 1988, no pet.)
(“An attorney’s failure to investigate or present witnesses will be a basis for
establishing ineffective assistance of counsel only where it is shown that the
witnesses would have been available and that the presentation of the evidence
would have benefitted appellant.”).

In the early stages of the case,
Bradt asked Starz to identify witnesses whom Starz believed would be helpful to
his defense.  In all, Starz identified approximately sixty-six people:  students,
teachers, and other individuals.  Private investigators were able to interview
five witnesses from the list Starz and Bradt compiled.  Bradt himself spoke
only to one witness, Renee Sides, Starz’s ex-wife, and he stated at the motion
for new trial hearing that it is his policy to talk to as few witnesses as
possible.  As an explanation for this strategy, Bradt testified that he wants
to avoid (1) becoming a trial witness himself in the event that a witness
offers testimony contradicting his or her interview, (2) being disqualified, or
(3) being accused of witness tampering.  It is both permissible and common for
an attorney to engage an investigator to interview witnesses before trial, and
the attorney may not always speak to witnesses already interviewed by
investigators.  See White, 160 S.W.3d at 53 (holding counsel not
ineffective for failing to contact or call at trial a witness based on
investigator’s interview of the witness).  Starz presents no showing that Bradt
would have learned more helpful information than his investigators did, and
therefore has not shown that Bradt’s decision in these circumstances fell below
a minimally acceptable standard.

Bradt’s investigators spoke with five
students who agreed to be interviewed.  These students offered facts about
Starz’s interactions with his students generally, and all of them said that
they did not witness the sexual assault on K.M. that she alleged occurred in
the classroom.  Based on these interviews, Bradt and his investigators determined
that none of the other students were likely to provide different information,
especially because K.M. alleged that Starz assaulted her behind his desk, where
no one else could see the assault.  See Hale v. State, 140 S.W.3d 381,
392 (Tex. App.—Fort Worth 2004, pet. ref’d) (holding counsel not ineffective
for failing to interview witnesses who could testify regarding defendant’s
interactions with child sexual assault victims but not to facts surrounding
alleged acts of sexual abuse or provide an alibi).

Starz also argues that Bradt should
have contacted Starz’s girlfriend at the time of the assaults, Amanda
Williamson.  Williamson indicated her unwillingness to speak to Bradt’s investigators
by failing to reply to their attempts to contact her, but Bradt nonetheless
subpoenaed her for Starz’s first trial setting.  Starz further alleges that
Bradt failed to interview a complainant in an extraneous offense that the State
intended to introduce at trial.  Other evidence, however, indicated that the
extraneous complainant recanted and said that the extraneous conduct never
occurred.  More important, testimony from the motion for new trial hearing indicates
that the extraneous complainant lived outside the subpoena range and did not
intend to cooperate as a witness.  Finally, Starz contends that Bradt did not
interview his ten-year-old son, who possessed information about the case.  In
the motion for new trial hearing, Renee Sides, Bradt’s ex-wife and his son’s
mother, testified that she made their son available to Bradt for an interview,
but she did not state what information his son possessed and whether it would have
been helpful to Starz’s defense.

Judy Young, Starz’s former
mother-in-law, is the only witness who testified at the motion for new trial
regarding the information she would have provided to Bradt and her availability
to testify at trial.  Starz claims Young offered an alibi because he was asleep
in his car in her driveway when she returned to her home shortly after the time
K.M. alleged that Starz assaulted her.  Starz never established, however, that
Young’s testimony about Starz’s whereabouts would have rebutted K.M.’s
testimony about the assault or that Starz’s sleeping in her driveway would have
precluded him from being at K.M.’s apartment at the earlier time when K.M.
alleged the assault occurred.  No one testified that the defense was unaware of
this information before Starz pleaded guilty.  Nathan Cook, Starz’s roommate at
the time of these offenses, also testified at the motion for new trial hearing
that he overheard some of the phone calls between Starz and P.M. and could
testify as to the circumstances of the text messages and phone calls.  Cook,
however, did not offer any exculpatory information regarding these
circumstances in his testimony.  Thus, since Starz did not show that these
witnesses either would have offered helpful information or been available to
testify at trial, Starz failed to establish that Bradt’s conduct fell below a
reasonable professional standard.

          Starz next contends that
Bradt failed to discover exculpatory evidence.  Starz argues that Bradt should
have obtained P.M. and K.M.’s school records because these records contained
evidence of both complainants’ behavioral problems and drug use.  At the motion
for new trial hearing, Bradt testified that he did not believe this evidence
would have been useful to Starz’s case.  He believed the school records would have
been inadmissible at trial, and that introducing evidence of the complainants’
possible drug use could have been dangerous because other witness interviews
indicated that Starz failed to act on in-class drug use by his students. 
Further, Bradt pointed out that even if evidence of P.M.’s drug use existed,
that evidence would not explain the hundreds of calls and text messages between
Starz and P.M. or why Starz lied to P.M.’s parents about her whereabouts on
Memorial Day.  Thus, Bradt did not believe that this evidence would have been
useful to Starz’s defense.  Even if such information is potentially helpful,
Starz has not shown that the defense was unaware of this information and that cross-examination
of the complaining witnesses at trial could not yield this information.

          Starz also contends that
Bradt should have sought independent testing of the DNA evidence from Amanda
Williamson’s apartment.  According to Bradt, the State did not collect or send
the DNA evidence for testing until August 2007, shortly before the second trial
setting.  The results were not available at the time of Starz’s plea.  Bradt
testified, however, that Starz panicked when Bradt told him that the State
decided to test the DNA evidence.  Starz, on the other hand, testified that he
was not concerned about the results.  The DNA test results, returned after
Starz’s plea, indicated that P.M. was linked to the DNA evidence taken from
Amanda Williamson’s apartment.  Without knowing whether the results of the DNA
testing would incriminate Starz, Bradt could not determine whether an
independent test of the DNA evidence would be necessary or a good use of
Starz’s economic resources.  We hold that the trial court did not err in
concluding that Bradt’s failure to conduct independent tests of the DNA
evidence in these circumstances does not constitute ineffective assistance of
counsel.

          We hold that Starz has not
shown that Bradt’s investigation fell below a minimally acceptable standard,
nor that the outcome of a prospective trial probably would have resulted in a
more favorable result, and that but for Bradt’s conduct, he would not have
pleaded guilty.  We therefore hold that the trial court did not abuse its
discretion in denying Starz’s motion for new trial on this ground.  

B. Failure to Prepare for Trial

Starz further contends that Bradt was
ineffective because he failed to adequately prepare for trial, necessitating
Starz’s acceptance of a guilty plea.  Specifically, Starz points to Bradt’s
failure to subpoena trial witnesses to either trial setting.  The clerk’s
record contains trial subpoenas for two witnesses for Starz’s first trial
setting:  Amanda Williamson and the custodian of records for Sprint.  The
record contains no subpoenas for the second trial setting.  Starz contends that
this is evidence of Bradt’s unpreparedness for trial.  Bradt testified,
however, that he prefers to file trial subpoenas shortly before trial in order
to prevent the State from discovering which witnesses he plans to subpoena. 
Furthermore, Starz and Bradt began to negotiate a guilty plea with the State at
the beginning of September, two or three weeks before the trial setting, before
trial subpoenas were necessary.  Starz also failed to show that the testimony
from these witnesses would have helped his defense.  We hold that the trial
court did not err in rejecting this contention.

Starz also contends that Bradt failed
to use Starz’s financial resources in an effective manner.  Starz claims that
the $50,000 the Starzes expended at Bradt’s direction on expert consultants
constitutes a misuse of the Starzes’ resources.  Starz contends that, instead,
Bradt should have hired other experts, such as an independent DNA expert. 
Starz argues that Bradt’s trial consultant, Kim Hart, provided no tangible
benefit to the defense, and Bradt was unable to articulate any specific benefit
she provided.  Bradt also directed Starz to consult with Joshua Karton, an
expert on courtroom presentation, whose services would only have been useful if
Starz had gone to trial.  Finally, Starz argues that Bradt consulted with
medical experts whose value to the defense is unclear.  Starz, however, fails
to show that these decisions are anything other than matters of trial strategy. 
See Wynkoop v. State, 251 S.W.3d 628, 631 (Tex. App.—Houston [1st Dist.]
2007, pet. ref’d) (holding that counsel’s trial strategy of calling experts to
testify that defendant was a good candidate for community supervision rather
than medical experts to refute causation of victim’s injuries was not
unreasonable, and thus counsel was not ineffective).  Starz cites Wright v.
State, 223 S.W.3d 36, 43–45 (Tex. App.—Houston [1st Dist.] 2006, pet.
ref’d), as a “very similar scenario” where counsel was ineffective for failing
to hire an expert to review the complainant’s therapist’s notes and testify
about the therapist’s deviations from standard protocol in a child sexual
assault case because the testimony would have supported the defendant’s
defensive theory of fabrication.  Wright, however, is distinguishable
because the defendant did not plead guilty but was found guilty by a jury, and
the defendant presented expert testimony at the hearing on the motion for new
trial on the alleged improper interview techniques used on the complainant.  Id. at 39, 41.  We hold that Starz failed to establish that Bradt’s conduct in
hiring experts was constitutionally ineffective; thus, the trial court did not
abuse its discretion in refusing to set aside the guilty plea on this point.

C.   Failure to Inform

Starz next contends that Bradt failed
to communicate information critical to his decision to plead guilty, rendering his
decision unknowing and involuntary.  In his brief, Starz argues that Bradt
“admits” that he relied on Starz’s own understanding of his constitutional
rights.  Bradt actually testified that he provided Starz with plea papers to
read, and asked Starz if he had any questions.  Bradt also stated that he
informed Starz that he would be giving up his right to a jury trial and there
would be no witnesses.  Starz further claims that Bradt failed to inform him of
the exact nature of the charges against him, failed to provide him with copies
of the indictments, misrepresented the extent of his experience in representing
sexual assault defendants, and, at the beginning of the representation, indicated
that Starz had a ninety percent chance of winning the case.  Bradt contested
all these allegations in his testimony at the motion for new trial hearing.

A guilty plea based on trial counsel’s
erroneous information conveyed to the defendant is involuntary.  Labib,
239 S.W.2d at 333; Fimberg, 922 S.W.2d at 207.  Starz, however, fails to
advance any incorrect facts or law provided by Bradt that affected Starz’s
plea.  Thus, Starz failed to overcome the prima facie proof that his plea was
knowing and voluntary, and failed to show that Bradt rendered ineffective assistance
of counsel by not informing him about his case.  We therefore hold that the
trial court did not abuse its discretion in refusing to grant Starz’s motion
for new trial.

II. Exclusion of Evidence Offered in
Starz’s Bill of Review

In
his second point of error, Starz contends that the trial court erred in
excluding evidence of Bradt’s history of client grievances filed against him,
which Starz offered in a bill of review through witness testimony and the
admission of an unrelated lawsuit against Bradt.  Starz argues that the trial
court’s refusal to admit this evidence impaired Starz’s ability to impeach
Bradt’s defense of his performance as Starz’s trial counsel, and Bradt’s
credibility was at the heart of the dispute between Starz and Bradt.  Starz
also argues that Bradt failed to inform him of his past bar suspensions, and
that information would have affected Starz’s choice to rely on Bradt’s judgment.
 Starz contends that the evidence in the bill of review impeaches Bradt by
showing specific cases where his failure to investigate resulted in sanctions.

The
admission or exclusion of evidence is within the sound discretion of the trial
court.  Williams v. State, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997).  Under
the Texas Rules of Evidence, it is impermissible to introduce evidence of other
crimes, wrongs, or acts to prove the character of a person in order to show
conformity therewith.  Tex. R. Evid.
404(b).  It is also impermissible to use extrinsic evidence to attack a
witness’s credibility with specific instances of conduct, other than the conviction
of a crime, unless the witness has testified about these matters in a manner
inconsistent with the evidence sought to be introduced.  See Tex. R. Evid. 608(b).  The matters that
Starz sought to admit fall within these kinds of inadmissible evidence.  Starz
did not establish a basis in the trial court for admission of this evidence as
an exception to the rules by relating Bradt’s past bar grievance history as
relevant in a way that might overcome the precepts of Rule 404(b)—like motive,
intent, plan, or pattern.  See Tex.
R. Evid. 404(b).  In addition, Starz does not present any evidence that
knowing Bradt’s history with other clients would have factored into his
decision to take a plea here, where he made no inquiry into Bradt’s history prior
to taking the plea, and points to no affirmative misrepresentation by Bradt
made in connection with the information relevant to the plea.  Thus, we hold
that the trial court did not abuse its discretion in excluding such evidence
from the motion for new trial hearing.




Conclusion

After reviewing the record, we hold
that Starz has failed to prove that his guilty plea was involuntary based on a
claim of ineffective assistance.  The trial court thus did not abuse its
discretion in denying Starz’s motion for new trial to set aside the plea.  We further
hold that the trial court did not abuse its discretion in excluding the
evidence Starz presented in his bill of review.  We therefore affirm the
judgment of the trial court.

 

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Justices Bland, Sharp,
and Taft.[3]

Justice Sharp, concurring, in an
opinion to follow.

Publish.  Tex. R. App. P. 47.2(b).









[1]
The offenses are as follows: (1) May 22, 2006
sexual assault of K.M. (trial-court case number 1084538; appellate case number
01-07-01074-CR), Tex. Penal Code Ann.
§ 22.011(a)(2)(C) (Vernon Supp. 2008); (2) May 24, 2006 sexual assault of
K.M. (trial-court case number 1084539; appellate case number 01-07-01075-CR), id.;
(3) May 29, 2006 aggravated sexual assault of P.M. (trial-court case number
1079811; appellate case number 01-07-01076-CR), Tex. Penal Code Ann. § 22.011(a)(2)(B) (Vernon Supp.
2008); (4) May 29, 2006 aggravated sexual assault of P.M. (trial-court case
number 1079812; appellate case number 01-07-01077-CR), Tex. Penal Code Ann. § 22.011(a)(2)(C) (Vernon Supp.
2008); (5) May 26, 2006 sexual assault of K.M. (trial-court case number
1079813; appellate case number 01-07-01078-CR), id.; and (6) May 23,
2006 improper relationship between educator (appellant) and student (K.M.)
(trial-court case number 1079814; appellate case number 01-07-01079-CR), Act of
May 30, 2003, 78th Leg., R.S., ch. 224, § 1, 2003 Tex. Gen. Laws 1042,
1042 (amended 2007) (current version at Tex.
Penal Code Ann. § 21.12(a) (Vernon Supp. 2008)).





[2] P.M. was thirteen at the time of the offenses.  K.M.
was fourteen at the time of the offenses.





[3] Justice Tim Taft, who retired from the First Court of
Appeals on June 1, 2009, continues to sit by assignment for the disposition of
this case, which was submitted on February 10, 2009.