**Dennis WRIGHT, Appellant,**

v.

**The STATE of Texas, Appellee.**

Nos. 01–05–00597–CR to
01–05–00599–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

July 27, 2006.

Discretionary Review Refused
Feb. 28, 2007.

Stanley G. Schneider, Schneider & McKinney, P.C., Houston, for Appellant.

David C. Newell, Assistant District Atty., Richmond, for State of Texas.

Panel consists of Justices JENNINGS, HANKS, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

A jury found appellant, Dennis Wright, guilty of the offenses of indecency with a child by exposure,[1] indecency with a child

---

1. *See* Tex. Pen.Code Ann. § 21.11(a)(2)(A) (Vernon 2003); Cause No. 38010A.

by contact,[2] and aggravated sexual assault of a child.[3] The jury assessed appellant's punishment at confinement for ten years in the exposure case, twenty years in the contact case, and life in the sexual assault case, with the sentences to run consecutively.[4] In two issues, appellant contends that he was denied his Sixth Amendment[5] right to effective assistance of counsel based on his trial counsel's failure to investigate and use an expert to present a defense and assist in the cross-examination of adverse witnesses.

We reverse and remand to the trial court for proceedings consistent with this opinion.

## Factual and Procedural Background

On April 23, 2003, a Fort Bend County Grand Jury issued a true bill of indictment, accusing appellant of the offense of indecency with a child by exposure. The State alleged that appellant had knowingly allowed his daughter, the six year-old complainant, to watch him masturbate. On October 9, 2003, the complainant began seeing Matthew Spears, a therapist. During the course of the sessions with Spears, the complainant made additional outcries that appellant had allowed her to "help" him masturbate[6] and had penetrated her sexual organ with his sexual organ.[7] On October 11, 2004, another Fort Bend

County Grand Jury issued another true bill of indictment, accusing appellant of the additional offenses of indecency with a child by contact and aggravated sexual assault of a child.

Carla Fair–Wright, the complainant's mother, testified that, in March 2001, she and appellant divorced after nine years of marriage. Fair–Wright explained that she and appellant agreed on a visitation schedule in which their two children visited appellant every other weekend and every Tuesday. On these occasions, both children would "usually spend the night at appellant's apartment," but on some occasions, the complainant would go to visit appellant alone.

Fair–Wright further testified that, on March 23, 2003, approximately one week after a scheduled visitation, while giving the complainant a bath at their home, the complainant told her that appellant "had to get the milk out, or he can't get the milk out." Fair–Wright explained that "[t]hen, [the complainant] demonstrated to [her] how he does that." Fair–Wright observed the complainant gesture back and forth with her hands in her groin area, and she understood the complainant to be telling her that appellant had masturbated in front of her. Following this exchange with the complainant, Fair–Wright called Child

---

**2.** *See* Tex. Pen.Code Ann. § 21.11(a)(1) (Vernon 2003); Cause No. 40922.

**3.** *See* Tex. Pen.Code Ann. § 22.021(a)(1)(B) (Vernon Supp.2005); Cause No. 40923.

**4.** *See* Tex. Pen.Code Ann. § 3.03(b)(2)(A) (Vernon 2003) (allowing sentences to run consecutively for offenses under sections 21.11, 22.011, 22.021, 25.02, or 43.25 committed against a victim younger than seventeen years of age).

**5.** U.S. Const. amend. VI.

**6.** The State's notice of outcry, filed January 28, 2005, states that "after [the complainant]

had begun counseling, she told her mother that sometimes [appellant] asked her if she wanted to help (make the 'milk' come out of his penis) and she said that 'sometimes I do help.' "

**7.** Spears's notes, contained in the record, reveal that during a May 19, 2004 session, when asked if appellant had ever put his penis inside her, the complainant responded that "[appellant] did sometimes, but it did not hurt." Neither party called Spears as a witness, and his notes were not admitted into evidence.

Protective Services ("CPS") and set up an appointment for both children. Fair–Wright also explained that, after the complainant began seeing Spears, and while the indecency with a child by exposure case was pending against appellant, the complainant gave her additional information about what had occurred at appellant's apartment on one other occasion where she "talked a little bit more about her father asking her to help." Fair–Wright then informed Spears, as well as Fort Bend County Assistant District Attorney Mike Hartman of this second outcry.[8]

On cross-examination, Fair–Wright testified that, prior to the allegations of indecency and sexual abuse, she had filed for divorce and pursued custody of the children; however, she denied telling the judge in the divorce proceeding that she wanted to move out of the country with the children. She agreed that the complainant had some previous behavioral problems starting in first grade, including one incident where she had taken a knife to school. The complainant's school had also called Fair–Wright on another occasion because the complainant "was acting in a very sexual manner" by "bumping up against [a] boy." Fair–Wright denied feeling any anger or bitterness toward appellant because of their divorce.

Christine Thomas, a former CPS investigator, testified that she observed the complainant's videotaped interview at the Children's Assessment Center ("CAC").[9] During this interview, the complainant told investigators that she had "seen her dad's penis with 'milk' all over it and observed her dad rubbing it." The complainant told investigators that when she asked her dad what he was doing, he became pale and told her that he did not want anyone to know because they "would make fun of him." Thomas believed the complainant's statements during the interview were "very clear and very age-appropriate."

Thomas further testified that she had interviewed appellant regarding the allegations. Thomas described appellant's behavior during the interview as "very evasive." She explained that, after initially denying the allegations, "[appellant] said exactly that [the complainant] had seen *him once.*" Thomas also stated that appellant "admit[ted] to saying that he had told her something about it was called Daddy's milk."

The complainant, who was eight years old at the time of trial, testified that appellant, her father, had stopped living at home with her, her mother, and her brother. After her parent's separation, the complainant and her brother would visit and spend the night with appellant at his new apartment. These visitations stopped after the complainant revealed to her mother that, during many of these visits,

---

**8.** The record is not clear on the timing of the complainant's subsequent outcry to her mother. Spears's notes reveal that on April 29, 2004, the complainant told him that "[appellant] never asked her to help him 'get the milk out.'" But on May 19, 2004, at the complainant's following therapy session, "[the complainant] asked her mom to leave and said her dad would get her to 'help' him...." It was the May 19th session in which the complainant also stated that appellant had contacted her sexual organ with his sexual organ.

**9.** Although Fair–Wright testified that she believed Christine Thomas had conducted the CAC interview, Thomas explained that she had only observed the interview "from a room directly connected to the video." It was Claudia Mullen, another investigator, who actually spoke to the complainant. Although Mullen is listed in the State's Notice of Outcry, neither the State nor the defense called Mullins to testify at trial.

she had seen appellant's sexual organ. The complainant had seen appellant's hands "on his pennis [sic]" and a "thick white liquid" or "milk" come out.[10] She further testified that she touched appellant's penis with her hands during "a lot" of her visits to appellant's apartment. She also described being on top of appellant and contacting appellant's sexual organ with her sexual organ, an activity that she called "humping."

On cross-examination, when asked whether certain people had "coached [her] on the answers and asked [her] the questions already," the complainant answered, "Yes." When asked to identify those people, the complainant named Suzy Morton, the prosecutor trying the case, as well as her therapist, Spears. However, she denied that her mother had been one of those people.

Appellant presented the testimony of three witnesses—a security guard from appellant's place of employment, the complainant's brother, and appellant. The security guard, Thu Martinez, testified that, according to an attendance log, appellant had signed into work for everyday of March 2003, excepting only the 18th, 19th, and 20th. On cross-examination, Martinez conceded that there were no times on the attendance log and he had no idea when or how long appellant had worked on any given day.

The complainant's brother, who was twelve years old at the time of trial, testified that, after his parents separated, he visited appellant alone and with his sister, but that his sister had never visited appellant without him. When asked whether he "[knew] of any instances where [the complainant] has lied or made up things," the

complainant's brother answered, "She lies a lot, you know." He explained that there were "lies like, 'I have like $5,000' and stuff like that. That kind of lie, you know, like silly lies."

Appellant testified that he and Fair-Wright divorced in March of 2001, and the divorce "was very acrimonious." Appellant explained that a dispute had arisen regarding custody of the children, and he believed that the charges against him were the result of this dispute. Appellant further testified that, in his opinion, the complainant's testimony consisted of "very well-coached statements." He denied having any sexual contact with the complainant or having the complainant watch him masturbate.

After the jury found appellant guilty and assessed his punishment, the trial court, on June 1, 2005, held a hearing on appellant's motion for new trial. At the hearing, Bernard Sacks, appellant's trial counsel, testified that he had limited access to the State's file prior to trial. Specifically, Sacks explained that he had not received Spears's notes from the complainant's therapy sessions. He testified that the first time he had seen a copy of the handwritten notes from Spears "was approximately a week or two before the trial" and that the first time he received a copy of the notes was "after the jury was impaneled and we were in the courtroom." When asked during the motion for new trial why he did not contact an expert witness, Sacks stated:

> I did not [contact an expert] because I was told ... I could not have the child interviewed and when I received [Spears's] notes, ... it was the night before we started putting on testimony,

10. At several points during her testimony, in lieu of a verbal response, the complainant answered questions pertaining to the sexual conduct of appellant by writing her responses on a piece of paper. Those answers were then read aloud by the State, and the trial court admitted the paper containing the complainant's responses into evidence.

so I had not time to take that to an expert.

Sacks added that, although he was aware of literature about child memory and fabrication of charges, he did not have time to obtain the assistance of an expert to help prepare such a defense. Sacks further testified that he had not tried an aggravated sexual assault of a child case prior to the instant case.

Spears's notes, which were introduced into evidence at the hearing, contain his record of the complainant's therapy sessions from the months following the complainant's initial outcry of indecent exposure through the time that the second Fort Bend County Grand Jury issued the second indictment accusing appellant of the more serious offenses of indecency by contact and sexual assault. The notes indicate that Fair–Wright was actually present during most of the sessions. In his initial "Behavioral Health Assessment" of the complainant, dated October 15, 2003, Spears wrote "Dad masturbated in bed while [the complainant] was lying next to him. *Possibility* he had [the complainant] masturbate him as well." (emphasis added). Thus, Spears's notes demonstrate that, from the outset, Spears suspected that appellant had involved the complainant in masturbation. This assessment was made nearly seven months prior to the complainant's May 19, 2004 outcry in which she stated that her father "asked her to help" him masturbate. In his notes of a March 30, 2004 therapy session, Spears reports, "[the complainant] said that the court won't let her see her dad because her mom is making them say that."

One month later, in an April 27, 2004 session, Spears reports, "[the complainant]

stated that her dad would pull his pants down and then make the 'milk' come out when he thought she was sleeping. She said he never asked her to help him 'get the milk out.' . . . She also said it was her fault for waking up." But in her very next session, on May 19, 2004, Spears's notes indicate that the complainant told him that appellant had the complainant "help" him masturbate and that it started when she was six years old.

Spears's notes also show that he met with assistant district attorney Mark Hartman to discuss the complainant's subsequent outcries [11] and that, on February 3, 2005, Suzy Morton, the lead prosecutor in the case, was present and participated in one of the complainant's therapy sessions. Spears's notes for the February 3rd session indicate that "[the] session was intended to give the complainant a chance to meet Ms. Morton and introduce her to the idea of having to tell her story again."

On cross-examination, Sacks conceded that he was never denied access to the State's file and that he was aware of Spears's existence and contact information at least thirty days prior to trial. However, he explained that, when he had first received Spears's notes, he had "great difficulty reading those." When asked why he did not ask for a continuance on the date of trial, Sacks stated "I didn't believe that [Spears's notes] . . . was [sic] discovery as such, because . . . it's very difficult to read." Sacks also stated that he believed that the trial court had ordered the State to provide him an expert report thirty days in advance of trial and that Spears would provide such a report.

Dr. Jerome Brown, a licensed psychologist, testified that he was very familiar

---

11. Spears's notes reflect a "L.M." between Spears and assistant district attorney Hartman on August 17, 2004 to discuss "[the complainant's] statements on [May 19, 2004]" and "possibly testifying this week."

with literature regarding false allegations of sexual abuse. Brown explained that his research found that custody disputes generate a high proportion of false allegations of sexual abuse. In his review of the complainant's statements and Spears's interview notes, Brown noticed an "extreme variation from the standard protocol of working with a child victim; and the particular variances from that protocol suggested that there was a very high potential for significant adverse influences upon the child that might have created ... a coercive environment in which she would be encouraged and pressured in various ways to make false allegations."

Brown noted that in the videotaped CPS interview of the complainant, the child initially told the interviewer that her father, appellant, did not know that she was watching him masturbate; however, "the interviewer ignored the child's statement or otherwise did not pursue it at all." Brown also stated that Fair–Wright's participation in the therapy sessions, as reflected by Spears's notes, would not allow the complainant an opportunity to alter any dynamic occurring between the child and the mother that could encourage the child to make a false statement. Brown added that Spears's notes demonstrated "a significant violation of professional boundaries" by the State's participation in therapy sessions. In Brown's opinion, based on his review of the initial CPS interview of the child and Spears's notes, the investigation of the case and the treatment of the child was not impartial.

Brown opined that a properly qualified expert would have been able to assist appellant's trial attorney in preparing a cross-examination that would clarify whether or not Spears's "improper methodology," and any other adverse influences, would influence the complainant to make false statements. Brown also stated

that an expert could have assisted in preparing for the cross-examination of the complainant and mother by providing an understanding of the dynamics of the custody battle between parents and explaining the dynamics between the father, daughter, and mother.

### Ineffective Assistance of Counsel

In his two issues, appellant contends that he was denied effective assistance of counsel when his trial counsel did not investigate his case or use an expert to present a defense and assist in the cross-examination of adverse witnesses. He asserts that an expert would have explained the improper impact that Spears's therapy may have had on the complainant and aided in the cross-examination of the complainant and Fair–Wright.

The standard of review for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Strickland* requires a two-step analysis whereby appellant must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's unprofessional error, there is a reasonable probability that the result of the proceedings would have been different. 466 U.S. at 687, 104 S.Ct. at 2064; *Vasquez v. State,* 830 S.W.2d 948, 949 (Tex.Crim.App.1992). *Strickland* defines reasonable probability as a "probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068. It is appellant's burden to prove ineffective assistance and he must overcome the strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Gamble v. State,* 916 S.W.2d 92, 93 (Tex.App.-Houston [1st Dist.] 1996, no pet.). A reviewing court determines the reasonableness of counsel's

challenged conduct in context and views it as of the time of counsel's conduct. *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim.App.2005). In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that his performance falls within the wide range of reasonable professional assistance or trial strategy. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999). A claim of ineffective assistance must be firmly supported in the record. *Id.*

Here, appellant complains that although Sacks's theory was that the allegations were false and were the result of acrimony that resulted from appellant's divorce, he did not introduce any evidence other than appellant's own testimony that his ex-wife was upset with him to support his theory of defense and refute the allegations.

As noted, Sacks stated that he had seen, in the State's file, Spears's notes from the therapy sessions "about a week" before trial, but he had great difficulty reading them and thought that Spears would have written a report with his findings prior to trial. Sacks "did not have an opportunity to review [Spears's notes] or have them reviewed by an expert to see if there might be evidence that would support [the] defense of fabrication." Thus, the record reveals that, at the time of appellant's trial, Sacks remained unaware of the contents of Spears's notes. Sacks also conceded that he knew, well in advance of trial, about the existence of Spears and was able to contact him. Sacks reiterated that he had great difficulty reading Spears's notes and "chose to wait for a report from him. Not handwritten notes, ... but to have a medical—or have an official report that's signed by him, ... signed by his supervisor ... that said he met with the child, that this was his con-

clusions." He further testified that even if Spears's notes had been in the State's file in January 2005, when the State filed its outcry notice, he wouldn't have been able to read them. He added that "[t]here were no conclusions on there, and not being an expert, I would have thought that Mr. Spears would have written a report with his findings, ... determining if the child was telling the truth or not telling the truth." With respect to the complainant's videotaped interview at the CAC, Sacks did not give specific reasons as to why he did not have an expert review the videotape. Based on this testimony at the motion for new trial, appellant asserts that his trial counsel "had no legitimate strategy to not contact an expert and because of his ignorance of the literature, counsel did not know how an expert might be of assistance based on the facts of the instant case."

The United States Supreme Court has explained "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 521–22, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003) (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066). In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Id.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.* at 521–22, 104 S.Ct. 2052.

In support of his argument that his counsel was ineffective because of his nonstrategic decision in failing to seek an expert's opinion, appellant relies on the recent Texas Court of Criminal Appeals decision in *Ex parte Briggs,* 187 S.W.3d 458 (Tex.Crim.App.2005). In *Briggs,* an injury-to-a-child case, the court concluded that "the failure by [Briggs's] attorney to take any steps to subpoena the treating doctors, withdraw from the case because [Briggs's] indigency prevented him from providing constitutionally effective assistance of counsel, or request state-funded expert assistance ... constituted deficient performance." *Id.* at 469. The court, in discussing trial counsel's failure to consult an expert to review medical records of the deceased child noted, "[t]his was not a 'strategic' decision, it was an economic one." *Id.* at 467. The court further noted that there had been no suggestion that trial counsel declined to fully investigate the medical records because he made a strategic decision that such an investigation was unnecessary or likely to be fruitless or counterproductive. *Id.* Instead, Briggs's trial counsel had stated to his client that he could not fully investigate the medical records or consult with experts until he had been paid an additional $2,500–$7,500. *Id.* at 466. The court held that "[Briggs]'s trial counsel's *financial* decision to do nothing about the obvious need to develop evidence concerning [the complainant's] medical history did not reflect reasonable professional judgment." *Id.* at 469 (citing *Wiggins,* 539 U.S. at 534, 123 S.Ct. at 2541–42). The court concluded that "[t]his was not a 'strategic' decision made after a full investigation of the facts and law." *Briggs,* 187 S.W.3d at 469.

Here, as in *Briggs,* appellant's trial counsel did not have a strategic motive for not fully investigating the complainant's therapy sessions or utilizing an expert to review Spears's notes or assist in the cross-examination of witnesses. In *Briggs,* trial counsel's decision was based on an economic rationale rather than a strategic one. In this case, Sacks explained that he did not hire an expert because (1) he was told that any expert he hired would not be able to interview the complainant, and (2) by the time he had received Spears's notes, he did not have time to contact an expert. Neither of these offered justifications constitutes a legitimate reason for Sacks's failure to fully investigate the facts relevant to appellant's case. Sacks also stated that he had difficulty reading Spears's report, and thought that Spears would provide a report with his findings. Again, the fact that Sacks had difficulty reading Spears's notes does not constitute a strategic or otherwise permissible reason for Sacks's failure to review the complainant's therapy records, particularly those records containing evidence that was obviously exculpatory. Instead, the record reflects that none of the potentially exculpatory evidence contained in Spears's notes was ever presented to the jury in appellant's trial.

An error in trial strategy will be considered inadequate representation only if counsel's actions are without any plausible basis. *Ex parte Burns,* 601 S.W.2d 370, 372 (Tex.Crim.App.1980); *Nelson v. State,* 881 S.W.2d 97, 101 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd). Given the nature of the allegations, Sacks's defensive theory of the case, and the exculpatory evidence contained in Spears's report, we conclude that it was unreasonable for Sacks to not fully investigate the contents of Spears's notes or consult an expert to pursue appellant's defensive theory. Sacks's stated reasons for not consulting with an expert, namely, that the expert would not be able to interview the complainant, that he did not have time after

looking at Spears's notes, and that he had difficulty reading the notes, do not justify his failure to fully investigate the complainant's therapy or explore other evidence, such as expert testimony, that would have supported appellant's defensive theory. Counsel's investigation did not reflect reasonable professional judgment. *See Wiggins,* 539 U.S. at 534, 123 S.Ct. at 2541–42. Accordingly, we hold that appellant's trial counsel's performance was deficient.

■ Further, and as noted above, to prevail on a claim of ineffective assistance, an appellant must not only show deficient performance by trial counsel, but must also show, beyond a reasonable probability, that, but for counsel's deficient performance, a different result would have occurred. *Thompson,* 9 S.W.3d at 812. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Initially, we note that the record reflects that appellant's trial counsel did consider possible fabrication and undue influence regarding the complainant's outcries. The record in this case includes a motion, filed December 8, 2003, wherein appellant, represented by Sacks, argued that the complainant's recorded interview should be suppressed at trial because "the questions were leading and suggestive of the answers for the child" and "the mother . . . is extremely biased in this matter." Appellant's subsequent motion to take testimony of the complainant was denied. During Sacks's cross-examination of the complainant, the complainant testified that the prosecutor and Spears had coached her answers and told her what to say. Also, as noted, appellant testified that he believed the charges were due to his refusal to cooperate with Fair–Wright's desire to move out of the country with the children. Sacks also elicited testimony from a CPS investigator regarding the complainant's statements during her videotaped CAC interview, in which she stated that appellant did not know that she had seen him masturbate.

However, despite the obvious strategy by Sacks to discredit complainant's outcry and prove fabrication or improper influence, he was entirely unaware of the contents of Spears's notes, including exculpatory evidence that would have advanced appellant's defensive theory. Sacks never presented evidence showing Fair–Wright's presence at nearly all of the complainant's therapy sessions. Moreover, Sacks never introduced into evidence the complainant's own statements, contained in Spears's notes, that "the court won't let [the complainant] see her dad because her mom is making them say that." Nor did he introduce into evidence the complainant's statement at the April 27, 2004 session that appellant "thought [the complainant] was asleep" and "never asked her to help him 'get the milk out' " —statements consistent with the complainant's initial comments during her CPS interview.

Moreover, we note that because Sacks failed to fully investigate the complainant's therapy notes, he could never have recognized any possible diversions from standard protocol of interviewing child sexual assault victims. If Sacks had uncovered such evidence, expert testimony such as that given by Dr. Brown at the motion for new trial could have been used to further advance appellant's defensive theory. Brown's testimony regarding false allegations of sexual assault occurring after a divorce and the accepted protocols for interviewing suspected child sexual assault victims would have been admissible as long as he did not comment directly about the truthfulness of the complainant in this case. *See Schutz v. State,* 957 S.W.2d 52, 59 (Tex.Crim.App.1997).

The bottom line is that exculpatory evidence in Spears's notes, expert testimony

about deviations from standard protocol reflected in the notes, and expert testimony regarding false allegations of sexual assault in connection with divorce proceedings constitute powerful evidence that would have supported appellant's defensive theory. At the very least, the assistance of such an expert to assist in the cross-examination of the adverse witnesses in this case could have made a significant difference in regard to the outcome of this case.

Accordingly, "without regard for the idiosyncrasies of the particular decisionmaker," we conclude that there is a reasonable probability, sufficient to undermine our confidence in the outcome of the case, that but for the deficient performance of trial counsel, the result of the proceedings would have been different. *See Briggs,* 187 S.W.3d at 470 (quoting *Hill v. Lockhart,* 474 U.S. 52, 59–60, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)).

We sustain appellant's two issues.

### Conclusion

We reverse the judgments of the trial court and remand for proceedings consistent with this opinion.