Opinion issued November 10, 2011.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NOS. 01-10-00204-CR and 01-10-00205-CR

———————————

Stephen Andrew Chalker, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 179th District Court

Harris County, Texas



Trial Court Case Nos. 1189838 & 1250648

 



MEMORANDUM OPINION

A jury convicted appellant, Stephen Andrew Chalker, of
indecency with a child[1]
and aggravated sexual assault of a child[2]
and assessed punishment at five years’ and twenty years’ confinement,
respectively.  In six points of error,
appellant contends that (1) the trial court erred in sustaining the State’s
hearsay objection to the testimony of I.C., L.C.’s cousin; (2) he was denied
effective assistance of counsel by his trial counsel’s failure to present a
bill of exception regarding I.C.’s testimony; (3) the trial court erred in
sustaining the State’s hearsay objection to testimony of Nancy Chalker,
appellant’s mother; (4) he was denied effective assistance of counsel by his trial counsel’s
failure to present a bill of exception regarding Nancy Chalker’s testimony; (5)
he was denied effective assistance of counsel by his trial counsel’s failure to
investigate and present forensic psychological evidence; and (6) he was denied
effective assistance of counsel by his trial counsel’s failure to present
evidence of the complainant’s motive to falsely accuse him of sexual
abuse.  

We
modify the judgments and affirm as modified.  


Background

The
complainant, L.C., appellant’s daughter, was born August 21, 1997.  Appellant and L.C.’s mother, I.K., separated
a month after her birth and divorced in March 1999.  When L.C. turned three, appellant was granted
custody for the 1st, 3rd, and 5th weekends of every month and every Wednesday
evening.  L.C.’s mother and appellant
both remarried and had additional children. 


L.C.
first accused appellant of forcing her to touch his genitals, which resulted in
the State charging him with indecency with a child.  Later, she accused him of causing her mouth
to contact his sexual organ, and the State added the charge of aggravated
sexual assault of a child.  

At
appellant’s trial, the State presented three outcry witnesses—L.C.’s mother, to
whom L.C. made a hand gesture; Children’s Assessment Center (“CAC”) forensic interviewer
Susan Odhiambo, to whom L.C. detailed the indecency with a child offense; and
Rose Marie Moran, a therapist, to whom L.C. detailed the offense of aggravated
sexual assault.  The State filed a motion
in limine, which the trial court granted, to exclude the hospital records
relating to an allegation of sexual abuse of L.C. that appellant had made
against I.K. in 2001.

I.K.
testified regarding the details of L.C.’s outcry to her.  L.C. was eleven years old at the time of her
initial outcry.  The day after L.C. made
her outcry, I.K. contacted a counseling center, a family lawyer, and CPS.  L.C. went to the CAC where she was
interviewed and given a medical exam. 
She began counseling sessions with Rose Marie Moran at the DePelchin
Children’s Center.  

Susan
Odhiambo testified regarding the details L.C. shared with her during their
interview.  On cross-examination,
Odhiambo agreed that children sometimes lie during these interviews.  Moran testified that L.C. made an outcry of
sexual assault to her.  Moran detailed
that she had worked once with a child who was coached to make a false
allegation because “the mother wanted to get custody of the child, and,
therefore, was having the child accuse the father of abuse.”  She testified that L.C. talked about “some
very conflicted relationships her father was having with his . . .
wife . . . and her witnessing some abusive situations.”

Defense counsel asked Moran about a child’s
“enhanc[ing] or advanc[ing] their allegations based on environmental
influences, like television, Internet, friends, conversations.”  Moran replied that,

I certainly can see that as a
possibility in my opinion.  And in the
children that I have worked with, that has not been one of the issues that I
have dealt with.  You know, when I sit
with a child, I do not take notes.  I sit
there and I study them.  I study all
their behavior language.  I hear what
they say and I hear what’s underneath what they say. I watch their feelings.  They don’t know that I know what is going on, but,
you know, I do.  And genuineness, when a
child is speaking—I don’t want to sound presumptuous, but I trust my ability to
read a child and whether or not they are talking about something that truly
happened to them or whether it’s something they are manufacturing. 

 

Moran further
testified that L.C. found appellant intimidating and was afraid of him.  

L.C. testified at trial that when she would
touch appellant’s “private area” “it would get straighter” and “sometimes white
stuff would come out.”  She also
testified that appellant “would make [her] put [her] mouth on his private
area.” He would lock the door when this was occurring so no one could walk in
on them.  L.C. testified that appellant
had previously slapped her for telling her mother that he had put his wife in a
headlock.  L.C. testified that she liked
her stepmother and her half-siblings. 
She testified that she told people she hated her father:

[Counsel]:             Did you ever tell anyone that you
hated your father?

 

[L.C.]:                   Yes.

 

[Counsel]:             Okay.
 Why did you tell them that you hated your
father?

 

[L.C.]:                   Because
I didn’t like the things he made me do to him and the things he did to me.  And I didn’t like seeing him and I told my mom
and my friends that I didn’t like him at all.

 

L.C. testified that her father had once spanked her
with a belt or a switch because she was “talking back.” 

Appellant
called I.C. and M.C., L.C.’s cousins. 
I.C. and M.C. spent the night with L.C. “most of the time” when she was
visiting appellant’s house.  I.C.
testified about L.C.’s relationship with her father: 

[Counsel]:             Okay.  Did [L.C.] ever tell you she was having any
problems with her dad?

 

[I.C.]:                    Just sometimes she said that
whenever he would spank her, she told me that she hated him.

 

[Counsel]:             So,
was there any other time that she said she hated him?

 

[State]:                 Objection.
 Hearsay, Your Honor.

 

[Court]:                Sustained.

 

[Counsel]:             What
about her step mom . . . ?

 

[I.C.]:                    She
didn’t really like her.

 

[Counsel]:             Okay.
 How did you know that she didn’t like her?

 

[I.C.]:                    She—

 

[State]:                 Hearsay,
Your Honor.

 

[Court]:                .
. . I sustain that as hearsay.  You can’t
repeat what someone said.  If they did
something, you can say that because you saw it, but you can’t repeat what someone
says.  Do you understand?

 

[I.C.]:                    Yes.

 

I.C. further testified that L.C. would
“roll her eyes” and “talk back to her parents” and that they would spank her
for that behavior.  Appellant also asked
I.C. about L.C.’s relationship with her siblings.  I.C. testified that L.C. was nice to her
brothers and sister, but she was also jealous of them and would sometimes hit
them.  M.C., I.C.’s sister, also testified about L.C.’s
relationship with her family.  She
testified that L.C. did not like her stepmother and that she was “really
jealous of [her brothers and sister] because they get more love than her.” 

Appellant’s
mother, Nancy Chalker, testified regarding her relationship with I.K.: 

[Counsel]:             Okay.
 Did you ever have any problems with [I.K.]?

 

[Nancy]                Well,
there was a time when [L.C.] had told something about—something that she
would do to her and—she said her mother had been doing some things to her and I was
a witness to that.

 

[State]:                 Objection,
Your Honor.

 

. . . .

 

[Court]:                Don’t
repeat what somebody else told you.

 

[Nancy]:               What
if I hear somebody saying something to me?

          

[State]:                 Can
we actually approach, Your Honor?

 

[Court]:                Yes.


 

[State]:                 Judge,
we’re concerned this is bordering on the motion in limine.

 

[Court]:                Yes,
there is already a motion in limine and I have ruled on it and I’m not going to
allow that. . . .  Let’s
move on to something else.

 

Bianca
Almaguer, who worked for CPS, testified that she was tasked with monitoring
appellant and his family from March to December 2009 during the CPS
investigation.  She testified that she
never witnessed any signs of abuse during this period of time.  Appellant complied with all the requirements
CPS demanded of him, and the CPS case is now closed.  On cross-examination, Almaguer testified that
there were abuse allegations against appellant regarding his use of severe
punishment and violence between appellant and his wife.  

Appellant’s
brother testified that he lived with appellant for approximately one year
between 2003 and 2004 and that L.C. visited during that time.  He testified that L.C. and her stepmother
were “[n]ot very close” and that her stepmother “never felt . . . that [L.C.]
was part of her family.”  Appellant’s
brother testified that L.C. “didn’t feel like her stepmother was treating her
right.  So, in other words, the bad
stepmother thing comes into play there, but a lot more than just that.” 

Appellant’s
wife, Stephanie Chalker, testified that she met appellant in January 2003 and
they moved in together in February of that year.  She also testified that her relationship with
L.C. was strained and that she confronted L.C. once “after finding out from my
husband that her behavior was because her mom told her to do it.”  She testified that L.C. was “very
disrespectful, picking on the kids, hitting them, talking back, not doing what
she was told, arguing back,” and that L.C. did not like her brothers and
sister.  She stated, “[L.C.] adored
them at one point in time, but she is very jealous at them because they have
their both parents together and she didn’t.  And she used to always want her mom and dad
back together.” 

L.C.’s stepmother
also testified about her feelings for L.C.:

[Counsel]:             How did you feel about [L.C.]?  How do you feel about [L.C.]?

 

[Stephanie]:          She is a really smart girl.  She gets everything she wants at her mom’s
house.  When she comes over here, she has
to fight for attention. Of course, having newborns, all of our attention and
time is devoted to the babies.  And as
much as we’d like to do more activities, you know, as adults, we don’t get to have
a whole lot of time and actually having days off.  I have never had a day off.

 

On
cross-examination, she elaborated that she was not close to L.C. in part
because L.C. was not her biological child. 

Appellant
testified that his wife and daughter had a strained relationship and that
“[t]hey didn’t get along at all.”  He stated:

[Appellant]:          When I overheard their conversation, either [L.C.] was
being rude, like really rude, trying to get on [my wife’s] nerves or [my wife]would
say something that would offend [L.C.] and hurt her feelings and make her sad.

 

[Counsel]:             How
did you feel about that?

 

[Appellant]:          I didn’t like it.  I
didn’t like the fact they argued.  It
wasn’t good.  It stressed me out.

 

[Counsel]:             Did
you ever do anything to make the situation better or intervene?

 

[Appellant]:          A lot of times, I would try to intervene and tell them they
didn’t need to be arguing, they needed to stop, or I would send [L.C.] to her
room.  I had to live with [my wife].  So, she would come over and they just wouldn’t
get along. . . .

 

The fighting between L.C. and her stepmother escalated until
appellant felt he had to choose between the two, and he essentially told L.C.
that he would choose his wife.  He
explained his thoughts on why L.C. would falsely accuse him of assaulting her: 

[Counsel]:             What reason do you think she would
come in here and tell all of these people that you committed those acts against
her if they didn’t happen?

 

[Appellant]:          Well, I personally believe it was out of spite and
jealously, probably anger.  I mean, you
know, when I married [her stepmother], they didn’t get along, maybe.

 

[Counsel]:             So,
do you think that [L.C.] is smart enough and—

 

[Appellant]:          I think she is smart enough and she knows more than she
lets on to know.

 

[Counsel]:             Do
you believe that [L.C.] would do something like make allegations against you
that could seriously harm you and they have to be proved?

 

[Appellant]:                   Yes,
I do.

 

[Counsel]:             Why
would she do that?

 

. . . .

 

[Appellant]:          Okay.  For one, the
last conversation I had with her, I told her that I might not be picking her up
again and I might not be seeing her again because of the problems I was having
with her and [my wife].  This was the day
after we had the birthday party for her.  And she got really upset about it.

 

[Counsel]:             You
think that would be enough to make her do something this serious?

 

[Appellant]:          Well, I mean, I am here—I don’t know what’s going through her head,
obviously, but . . . .

 

The jury
found appellant guilty of indecency with a child and aggravated sexual assault
of a child.  The trial court sentenced
appellant to five years’ confinement and twenty years’ confinement,
respectively.  These sentences were
cumulated pursuant to a motion by the State, and the trial court ordered that
appellant serve the sentences consecutively when it made its oral pronouncement
of the sentences on the record in open court. 
However, the written judgments reflect that appellant is to serve his
sentences concurrently.  

Appellant,
represented by new counsel, moved for a new trial arguing that he received
ineffective assistance of counsel. 
During the hearing on appellant’s motion for a new trial, his trial
counsel, Kennitra Foote, explained her trial strategy.  She testified that she consulted with Dr.
Long, “a psychologist or psychiatrist or an expert in the soft sciences,” over the course of about
three days in
preparation for the trial.  Foote stated
that Dr. Long told her that the 

case
was going to boil down to what I had already pretty much assessed, which is the
credibility or the perceived truthfulness of each party.  [Dr. Long] said that the alienation by [appellant’s
wife] of [L.C.] could definitely be a factor, but she said it would really all
boil down to what [L.C.] ended up testifying to, which at that time I didn’t know,
and I don’t think anybody else knew, I definitely didn’t know she would be
saying the things that she said.

She
testified that she interviewed seven of appellant’s family members including M.C.,
I.C., and his mother, brother, and wife and prepared their testimony.  Counsel read books and conducted internet
research about parental alienation.  She
also explained that her trial strategy was affected by the trial court’s
rulings excluding M.C.’s and I.C.’s testimony regarding specific conversations
with L.C., appellant’s mother’s testimony regarding her discussions with L.C.’s
mother, and evidence of the 2001 accusations against L.C.’s mother.  Foote believed that testimony was admissible
and thought it would demonstrate the dysfunction in the family that would
motivate L.C. to make a false accusation against her father.

Regarding Foote’s decision not to call an
expert witness to testify, appellant asked: 


[Appellant]:          Now, were you aware that an expert
witness can consider evidence that might not be admissible as a basis for
explaining an opinion?

 

[Foote]:                Yes.

 

          . . . .

 

[appellant]:           So, things that the Court deemed
inadmissible might have been explained by an expert in presenting your defense
that you thought was relevant?

 

[Foote]:                Yes, it’s possible.

 

. . . .

 

[Appellant]:          So, were you able, during the course
of the trial, based on the Court’s ruling, to go back and get an expert to
bring in to support your defenses?

 

[Foote]:                I could have, but I didn’t.

 

Foote
later explained why she did not call an expert:

 

I really—I didn’t call an expert because [L.C.]’s
testimony was so strong, I felt that if I went out and got an expert after the
fact, if I had called Dr. Long in to come and testify regarding, you know, the
information that she already knew, that it was going to make him, [appellant],
look like, I guess, more of a monster than what—even though [L.C.] didn’t paint him
as one, I didn’t want to sully that connection or that relationship they had
anymore by bringing someone in to call her a liar.

 

. . . .

 

. . . Rose Marie Moran, who was the therapist that had been
dealing with [L.C.], she actually was—she wasn’t an expert that I brought, but at
the same time, she did go over the alienation and contamination.  We talked about that in cross-examination.  And, actually, she was a very good witness for
that information.  She was warm.  She was very direct and open.  And unlike most people that are brought in,
you know, for the other side, she didn’t have any hostility.

So, the questions that I asked her—and, actually, that’s another reason
why I didn’t feel that I needed to go out and get somebody because she was actually
a very good source of information.  I
even asked her, you know, what percentage of children have you dealt with, and
she said she’s dealt with a lot of high-risk children in very bad situations.  I asked her what percentage of the children
that she dealt with had been found to be untruthful.  And she admitted there was a percentage, it
was a small percentage, but there were children that had been untruthful.  And she went on to say that when she found
them out, she did expose them.  And she
had several times where she actually had to come into court and expose the
children for being untruthful.

 

Appellant also asked Foote about her
decision not to file bills of exception: 

[Appellant]:          You’re aware that without a bill of exceptions being made
as to excluded testimony, nothing is being presented for appellate review?

[Foote]:                Yes,
I’m aware of that.

 

[Appellant]:          So, you are aware during the course of trial you did not
preserve any error concerning exclusion of any testimony by the Court?

 

[Foote]:                Actually,
that’s not true.  I didn’t do a bill of
exceptions, but I did object and I did make statements on the record regarding
the testimony or the exclusion of the testimony, but, no, I didn’t do a bill of
exceptions.

 

At
the hearing on the motion for new trial, I.C. and M.C. both testified that L.C.
told them that her stepmother would not let her be in a family photo, which made
her feel excluded and unwanted.  They also
both testified that L.C. did not get along with her stepmother and had told
them she did not like her stepmother and appellant.  Appellant’s mother did not testify at the
motion for new trial hearing, so there is no record of what her testimony would
have been had it not been excluded as hearsay.

Appellant called Dr. Jerome Banks
Brown to testify as an expert at the hearing on the motion for new trial.  He discussed false allegations of sexual
abuse made by children, specifically that “the probability of a false
allegation is greatly increased, probably tripled in divorce or child custody
battle situations.”  He stated that as an expert in situations
such as this he would create a social history:

[Appellant]:          And in creating a social history, what
does the expert do?

 

[Brown]:               Well,
there is a certain, let’s say, amount of information that the mental health
professional needs to have, typically, to render an opinion, to give a diagnosis,
to make a treatment plan.  There [are]
certain areas of a person’s life that are not relevant, there are certain areas
of their life that’s very relevant.  And,
hopefully, the mental health professional will cover those with the materials
he’s gathering, including the material from the person he is examining directly.  In creating said history he would interview
witnesses and family members, look at documents pertaining to the relationship
between the parties.

 

Brown
went on to testify that creating a social history would include looking at
documents that pertain to the relationship between the parties, such as prior
medical records, documents pertaining to child support and custody, threats
made by one spouse against the other, and “statements made by a child to
another child, animus towards a parent or statements concerning feeling
excluded.” 

The trial court denied appellant’s motion
for new trial, and this appeal followed.

                                                                                                                                                                         
Hearsay 

In
his first and third points of error, appellant argues that the trial court
erred in sustaining the State’s hearsay objection to I.C.’s and appellant’s
mother’s testimony.  I.C.’s testimony
concerned conversations she had with L.C., while appellant’s mother’s testimony
concerned conversations with L.C.’s mother. 


Hearsay is a statement, other than one made by the
declarant while testifying at trial, that a party offers to prove the truth of
the matter asserted.  Tex. R. Evid. 801(d); Baldree v. State, 248
S.W.3d 224, 230–31 (Tex. App.—Houston [1st Dist.] 2007, pet. ref’d).  Hearsay
statements are inadmissible, except as provided by statute or other rule.  Tex.
R. Evid. 802.  A statement that is not offered to prove the
truth of the matter asserted, but rather is offered for some other reason, does
not constitute hearsay.  Guidry v. State, 9 S.W.3d
133, 152 (Tex. Crim. App. 1999) (citing Jones v. State, 843
S.W.2d 487, 499 (Tex. Crim. App. 1992), overruled on other grounds, Maxwell v. State, 48 S.W.3d 196 (Tex. Crim. App. 2001)); Yanez
v. State, 199 S.W.3d 293, 307 (Tex. App.—Corpus
Christi 2006, pet. ref’d) (“A statement not offered to prove the truth of the
matter asserted is not hearsay.”).
 “Matter asserted” includes any matter
explicitly asserted and any matter impliedly asserted by the statement “if the
probative value of the statement as offered flows from the declarant’s belief
as to the matter.”  Tex. R. Evid. 801(c).

A.              
Standard of Review

To admit
evidence pursuant to a hearsay exception, “the proponent of the evidence must
specify which exception he is relying upon.”  Willover v. State, 70
S.W.3d 841, 845 (Tex. Crim. App. 2002); see also Reyna v. State, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005) (“So it is not enough to tell the judge that evidence is admissible.  The proponent, if he is the losing party on
appeal, must have told the judge why the evidence was admissible.”).  It is the duty of the appellant, not the trial
court, to articulate the applicable hearsay exception or specify how the
challenged evidence is not hearsay.  Willover, 70 S.W.3d at 845–46.  The party complaining on appeal “must, at the
earliest opportunity, have done everything necessary to bring to the judge’s
attention the evidence rule or statute in question and its precise and proper
application to the evidence in question.”  Martinez v. State, 91 S.W.3d 331, 335–36 (Tex. Crim. App.
2002).  The issue is “whether the
complaining party on appeal brought to the trial court’s attention the very
complaint the party is now making on appeal.”  Reyna, 168 S.W.3d at 177 (quoting Martinez, 91 S.W.3d at 336); see also Pena
v. State, 285 S.W.3d 459,
464 (Tex. Crim. App. 2009) (“To avoid forfeiting a complaint on appeal, the
party must ‘let the trial judge know what he wants, why he thinks he is
entitled to it, and to do so clearly enough for the judge to understand him at
a time when the judge is in the proper position to do something about it.’”
(quoting Lankston v. State,
827 S.W.2d 907, 908–09 (Tex. Crim. App. 1992))).  Preservation of error also depends on whether
the complaint made on appeal comports with the complaint made at trial.  Pena, 285 S.W.3d at 464 (citing Reyna, 168 S.W.3d at 177).

An appellate court reviewing a
trial court’s ruling on the admissibility of evidence employs an abuse of
discretion standard of review.  Weatherred
v. State, 15 S.W.3d 540,
542 (Tex. Crim. App. 2000).  The
appellate court will uphold the trial court’s ruling if it was within the zone
of reasonable disagreement.  Id.  In addition, the appellate court must review
the trial court’s ruling in light of the evidence before the trial court at the
time the ruling was made.  Id.

B.              
Analysis

The State objected twice to I.C.’s testimony on the basis of
hearsay, and both times the trial court sustained the objection without any
argument by Foote, appellant’s trial counsel:

[Foote]:                So,
was there any other time that she said she hated him?

 

[State]:                 Objection.
 Hearsay, Your Honor.

 

[Court]:                Sustained.

 

[Foote]:                What
about her step mom . . .?

 

[I.C.]:                    She
didn’t really like her.

 

[Foote]:                Okay.
 How did you know that she didn’t like her?

 

[I.C.]:                    She—

 

[State]:                 Hearsay,
Your Honor.

 

[Court]:                .
. . I sustain that as hearsay.  You can’t
repeat what someone said.  If they did
something, you can say that because you saw it, but you can’t repeat what
someone says.  Do you understand?

 

[I.C.]:                    Yes.

 

[Foote]:                So,
how did you know other than saying—what made you—did she do things to show you she
didn’t like her step mom?

 

Again, when the State objected to
appellant’s mother’s testimony on the basis of hearsay, the trial court sustained
the objection without argument from Foote:

[Foote]:                Okay.  Did you ever have any problems with [I.K.]?

 

[Nancy]:               Well,
there was a time when [L.C.] had told something about—something that she
would do to her and—she said her mother had been doing some things to her and I was
a witness to that.

 

[State]:                 Objection,
Your Honor.

 

Appellant’s
trial counsel did not make any argument to the trial court regarding why the
evidence was admissible, either because it was not hearsay or because a
particular hearsay exception applied. 
Thus, these arguments are not preserved for appeal.  See Reyna, 168 S.W.3d at 177; Willover, 70 S.W.3d at 845.  

We overrule appellant’s first and
third points of error.  

                                                                                                                                               
Ineffective Assistance 

In his second, fourth, fifth, and
sixth points of error, appellant argues that he was denied effective assistance
of counsel.  First, he argues that his
trial counsel fell below a reasonable standard of representation by failing to
present bills of exception regarding I.C.’s and appellant’s mother’s
testimony.  Next, he argues that trial
counsel failed to investigate and present forensic psychological evidence.  Finally, appellant argues that trial counsel
failed to present evidence of L.C.’s motive to present false allegations of
sexual abuse. 

A.              
Standard of Review

To make a showing of ineffective assistance of counsel, an
appellant must demonstrate that (1) his counsel’s performance was deficient and
(2) there is a reasonable probability that the result of the proceeding would
have been different but for his counsel’s deficient performance.  Strickland
v. Washington, 466 U.S. 668, 687,
694, 104 S. Ct. 2052, 2064, 2068 (1984); Cannon v. State, 252 S.W.3d 342,
348–49 (Tex. Crim. App. 2008).  The
appellant must prove ineffectiveness by a preponderance of the evidence.  Perez
v. State, 310 S.W.3d 890, 893 (Tex. Crim.
App. 2010).  

The appellant must first show that his counsel’s
performance fell below an objective standard of reasonableness.  Robertson
v. State, 187 S.W.3d 475, 483 (Tex. Crim.
App. 2006); Thompson v. State,
9 S.W.3d 808, 812 (Tex. Crim. App. 1999).  The second prong of Strickland requires the
appellant to demonstrate prejudice—a reasonable probability that, but for his
counsel’s unprofessional errors, the result of the proceeding would have been
different.  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Thompson, 9 S.W.3d at 812.  A reasonable probability is a probability
sufficient to undermine confidence in the outcome.  Strickland,
466 U.S. at 694, 104 S. Ct. at 2068. 

We indulge a strong presumption that counsel’s conduct fell within the
wide range of reasonable professional assistance, and, therefore, the appellant
must overcome the presumption that the challenged action constituted “sound
trial strategy.”  Id. at 689, 104 S. Ct. at 2065; Williams v. State,
301 S.W.3d 675, 687 (Tex. Crim. App. 2009).  Our review
is highly deferential to counsel, and we do not speculate regarding counsel’s
trial strategy.  Bone v. State,
77 S.W.3d 828, 833 (Tex. Crim. App. 2002).  To prevail, the appellant must provide an
appellate record that affirmatively demonstrates that counsel’s performance was
not based on sound strategy.  Mallett v. State,
65 S.W.3d 59, 63 (Tex. Crim. App. 2001); see Thompson, 9 S.W.3d at 813
(holding that record must affirmatively demonstrate alleged ineffectiveness). 

B.              
Failure to Present Bills of Exception  

In his
second and fourth points of error, appellant argues that because his trial
counsel did not proffer a bill of exception regarding the testimony excluded as
hearsay, that the error is not preserved for appeal.  Based on this alleged mistake, appellant
argues that his trial counsel provided ineffective assistance.  We construe appellant’s argument to be that
his trial counsel was ineffective in failing either to get the evidence
admitted or to preserve error.  

Appellant has not shown that he was prejudiced by
any failure on Foote’s part to present I.C.’s or appellant’s mother’s testimony
or to preserve his right to challenge on appeal the trial court’s exclusion of
that testimony.  Appellant argues that
I.C.’s and M.C.’s testimony, as established at the motion for new trial hearing,
would have related conversations with L.C. that would “impeach [her] testimony
regarding the very essence of the allegations against appellant.”  However, the majority of the testimony
presented by I.C. at the motion for new trial hearing was also presented in
some way at trial—the trial record is replete with
testimony from I.C., M.C., L.C., I.K., Almaguer, the CPS investigator,
appellant, and his brother and wife that L.C. had problems with both her father
and her stepmother, that she was jealous of her half-siblings, that L.C. felt
excluded, and that the relationships between L.C.’s mother, appellant, and his
wife were strained.  

The only specific incident related by I.C. during
the hearing on the motion for new trial that was not contained in the trial
record is the incident when appellant’s wife excluded L.C. from family
photographs.  In light of all of the
similar evidence that was presented at trial, this one incident is not so
significant that we can conclude that the outcome of the trial would have been
different had the jury heard that testimony. 


Likewise, appellant does not present any argument
that additional testimony by appellant’s mother concerning L.C.’s mother’s
“acrimonious relationship” with appellant would have changed the course of the
proceedings.  The trial record contained
evidence that L.C.’s mother and appellant were divorced and had a strained
relationship.  Thus, appellant has failed
to demonstrate ineffective assistance of counsel on these grounds.  See Strickland,
466 U.S. at 687, 104 S. Ct. at 2064; Cannon, 252 S.W.3d at
348–49.

We overrule appellant’s second and fourth points of error.  

C.              
Failure to Investigate and Present Forensic
Psychological Evidence

In his fifth point of error, appellant argues he was denied effective
assistance of counsel because Foote failed to investigate and present forensic
psychological evidence.  Specifically,
she did not rely on an expert at trial. 

Trial counsel has a duty “to make reasonable
investigations or to make a reasonable decision that makes particular
investigations unnecessary.”  McFarland v. State,
928 S.W.2d 482, 501 (Tex. Crim. App. 1996) (quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066).  A decision to not investigate “must be
directly assessed for reasonableness in all the circumstances, applying a heavy
measure of deference to counsel’s judgments.”  Id.
(quoting Strickland,
466 U.S. at 691, 104 S. Ct. at 2066).  In
determining whether trial counsel adequately investigated potential mitigating
evidence, “we focus on whether the investigation supporting [trial] counsel’s
decision not to introduce mitigating evidence . . . was itself reasonable.”  Wiggins v. Smith,
539 U.S. 510, 523, 123 S. Ct. 2527, 2536 (2003) (emphasis in original); Freeman v. State, 167 S.W.3d 114, 117 (Tex. App.—Waco
2005, no pet.).  Trial counsel is not
required “to investigate every conceivable line of mitigating evidence no
matter how unlikely the effort would be to assist the defendant at sentencing.”
 Freeman, 167 S.W.3d at
117.  “Strategic
choices made after thorough investigation of law and facts relevant to
plausible options are virtually unchallengeable; and strategic choices made
after a less than complete investigation are reasonable precisely to the extent
that reasonable professional judgments support the limitations on
investigation.”  Wiggins, 539 U.S. at 521–22, 123 S. Ct. at 2535 (quoting Strickland, 466 U.S. at 690–91,
104 S. Ct. 2052).

When an appellant argues that his trial counsel’s
conduct amounted to ineffective assistance by failing to call an expert
witness, the appellant must show that the expert’s testimony would have been
beneficial to him.  See Cate v. State,
124 S.W.3d 922, 927 (Tex. App.—Amarillo 2004, pet. ref’d); Teixeira v. State,
89 S.W.3d 190, 194 (Tex. App.—Texarkana 2002, pet. ref’d).  The appellant
must also show that the witness was available to testify.  Butler v. State, 716 S.W.2d 48, 55
(Tex. Crim. App. 1986); Johnston
v. State, 959 S.W.2d 230, 236 (Tex. App.—Dallas
1997, no pet.).

Foote testified that she investigated a potential
forensic psychological defense by meeting with an expert, Dr. Long, and that,
after this meeting, she chose not to present this defense.  Foote testified that she decided not to have
Dr. Long testify because she did not want to appear to be attacking L.C., which
Foote believed would have further damaged appellant’s credibility with the
jury, and because she believed the relevant testimony was covered by her
cross-examination of Moran.  We must
assume, absent evidence to the contrary, that Foote’s decision not to hire an
expert to testify was driven by sound trial strategy.  See Bone,
77 S.W.3d at 833.  

Appellant relies primarily on two cases, Wright v. State and Ex Parte Briggs, to support his proposition that Foote’s failure to
hire an expert amounts to ineffective assistance of counsel.  Ex
Parte Briggs is factually distinguishable. 
Briggs’s trial counsel told his client he
could not fully investigate the medical records or consult with experts until
he had been paid an additional $2,500–$7,500.  187
S.W.3d 458, 466 (Tex. Crim. App. 2005). 
The court noted counsel’s action “was not a ‘strategic’ decision,
it was an economic one.”  Id. at 467.  The Court of Criminal Appeals held that while
counsel is not required to pay for experts out of his own pocket, he must work
to advance his client’s best defense and find another way to provide expert
testimony.  Id. at 467–68.

Here, unlike in Briggs, there is
no assertion that trial counsel’s decision was an economic one or something
similar; rather, Foote explained that she did not want to
“sully that connection or that relationship [between appellant and L.C.] anymore
by bringing someone in to call [L.C.] a liar.” 
See Ex parte McFarland, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005)
(holding that it is valid trial strategy not to attack
sympathetic witness).  

In Wright v. State, defense counsel stated he did not hire an expert “because (1) he was told that
any expert he hired would not be
able to interview the complainant, and (2) by the time he had received [the
therapist’s] notes, he did not have time to contact an expert.”  Wright v. State, 223 S.W.3d 36, 43 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d).  Wright’s defense counsel also stated that he
had trouble reading the report by the therapist who interviewed the complainant
because he could not read the therapist’s handwriting and he thought the
therapist would provide a typed report with his findings.  Id.  Wright later presented expert testimony
at the motion for new trial hearing on potentially improper interview
techniques used by the therapist on the complainant.  Id. at 39, 41.  This Court concluded that exculpatory evidence
in the therapist’s notes, expert
testimony about deviations from standard protocol reflected in the notes, and expert testimony concerning false
allegations of sexual assault in connection with divorce proceedings constitute
powerful evidence that would have supported appellant’s defensive theory, and
the failure to use this evidence constituted ineffective assistance of counsel.  Id. at
44–45.  

The evidence presented by appellant
regarding what an expert witness would have contributed to his defense is much
less than that presented in Wright.  Here, appellant’s expert did not discuss any
potential exculpatory evidence, but he testified generally about allegations of
sexual abuse.  Appellant’s expert did not specifically identify any testimony that would
have supported appellant’s defense; he only testified regarding what type of
investigation he would have conducted.  

Foote testified that she investigated
appellant’s case and consulted with an expert, and appellant has not proven
that the level of consultation and other investigation was not reasonable.  See
Wiggins, 539 U.S. at 523, 123 S. Ct. 2536; Freeman, 167 S.W.3d at 117.  Nor has appellant established that Foote’s
decision not to call an expert was not part of a sound strategy.  See Bone,
77 S.W.3d at 833.  Additionally, appellant has not demonstrated, with specificity, what the
expert would have testified to that would have aided his defense—a requirement
to succeed in a claim of ineffective assistance of counsel for failure to call
an expert witness.  See Cate, 124 S.W.3d at 927; Teixeira,
89 S.W.3d at 194.

Thus,
appellant has not proven ineffective assistance of counsel in not investigating
the forensic psychological evidence or in not obtaining an expert to testify.  

We overrule appellant’s fifth
point of error.

D.              
Failure to Present Evidence of Complainant’s
Motive for False Allegation

In his
sixth point of error, appellant argues that Foote did not provide effective
assistance because she did not present evidence as to L.C.’s motive to present
false allegations of sexual abuse, including the poor relationships among L.C.,
her mother, her stepmother, and appellant. 


Appellant
contends that because the full testimony of I.C., M.C., and appellant’s mother
was not developed, Foote did not sufficiently present appellant’s defensive
theory—that the family acrimony provided a motive for L.C. to make a false
allegation.  Appellant argues that the
excluded evidence would have been admissible had it been introduced through
expert testimony.  However, as stated
above, appellant failed to prove that trial counsel’s decision not to employ an
expert was not part of a sound trial strategy.

Furthermore, appellant has not shown that he was
harmed by Foote’s failure to develop this particular evidence further.  As we have already stated, the trial record
contained testimony from multiple witnesses concerning the strained
relationships in L.C.’s family.  L.C.,
appellant, and his wife all testified that L.C. did not get along with her stepmother and
siblings.  Appellant testified that he
had told L.C. that she might need to quit visiting his home because of this
strife.  Appellant’s brother testified
that L.C. “didn’t feel like her stepmother was treating her right.  So, in other words, the bad stepmother thing
comes into play there, but a lot more than just that.”  Testimony that L.C.’s mother and appellant
were divorced introduced the potential for false allegations pursuant to
divorce and custody issues, as did appellant’s wife’s testimony that she once
confronted L.C. about her bad behavior when she learned that L.C. misbehaved
“because her mom told her to do it.”  It
was apparent in the record that L.C. and her stepmother did not get along, that
L.C. was jealous of her siblings, and that her father was likely to choose them
over her.  Appellant does not establish
that additional evidence concerning the acrimony in the family would have
further demonstrated L.C.’s motive to file a false allegation, thereby changing
the result of the trial.

Appellant
relies on S.J.P. v. Thaler, where the
defendant’s trial counsel failed to investigate, failed to use character
witnesses at trial, introduced a prior offense that harmed appellant’s defense,
allowed prosecution witnesses to testify without any objection, did not hire an
expert to aid his defense, and failed to present testimony that, if used, could
have clearly rebutted the State’s case.  No. 4:09-CV-112-A, 2010 WL 5094307,
at *16–17 (N.D. Tex. Dec. 3, 2010).  S.J.P. is distinguishable from the
instant case.  

Here, Foote testified that she investigated appellant’s case and
that she made a strategic decision not to call an expert to testify, she
thoroughly cross-examined the State’s witnesses, and she called several
witnesses on appellant’s behalf.  Appellant does not raise any specific testimony that
would have clearly rebutted the State’s case. 
Thus, appellant has failed to demonstrate ineffective assistance of
counsel on these grounds.  See Strickland, 466 U.S. at 687,
104 S. Ct. at 2064; Cannon,
252 S.W.3d at 348–49.

We overrule appellant’s sixth
point of error.  

Reformation
of Judgments

The State asks that we reform
the judgments to reflect that appellant’s sentences are to run
consecutively.  This Court has the
authority to modify incorrect judgments when the necessary data and information
to do so are available.  See Tex.
R. App. P. 43.2(b) (providing that court of appeals may modify judgment
and affirm as modified); Bigley v. State,
865 S.W.2d 26, 27 (Tex. Crim. App. 1993);
Asberry v. State, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet.
ref’d).  The oral pronouncement of a
sentence controls if there are variations between the pronouncement and the
written judgment, which simply memorializes the pronouncement.  Coffey
v. State, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998).

Here, the trial court ordered that
appellant serve both sentences consecutively when it made its oral
pronouncement of the sentences on the record in open court.  This pronouncement controls over the written
judgments, which reflect that appellant is to serve his sentences
concurrently.  Therefore, we modify the
written judgments to reflect that appellant is to serve his sentences
consecutively.




 

                                                                                                                                                                   
Conclusion

We modify the judgments of the trial court and affirm as
modified.

 

 

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel consists of Justices Keyes, Higley, and
Massengale.

Do not publish. 
 Tex. R. App. P. 47.2(b).

 











[1]        See
Tex. Penal
Code Ann. § 21.11 (Vernon 2011).

 





[2]        See
Tex. Penal
Code Ann. § 21.021
(Vernon 2011).