

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00285-CR

Jason Clay **DOTSON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2012CR10439
Honorable Ron Rangel, Judge Presiding

Opinion by:   Marialyn Barnard, Justice

Sitting:      Marialyn Barnard, Justice
              Patricia O. Alvarez, Justice
              Jason Pulliam, Justice

Delivered and Filed:  July 15, 2015

AFFIRMED

A jury found appellant, Jason Dotson, guilty of aggravated sexual assault, and the trial court assessed punishment at forty-five years' confinement. In three issues on appeal, Dotson asserts he was denied effective assistance of counsel and the trial court erred in admitting the testimony of a trial witness under Texas Rule of Evidence 612. We affirm.

## BACKGROUND[1]

The complainant was eighteen years old and living with two roommates, Lisa and Mike, at the time of the assault. Complainant testified that at around 10:00 p.m. on October 23, 2012, she decided to go to her mother's house for a visit. Complainant said her mother lived in a rural area on Peaceful Lane, and the house sat back from the road. Because complainant did not have her own car, Mike drove her to her mother's house. Complainant discovered her mother was not at home, and, because Mike had already driven away, complainant decided to walk to a nearby convenience store on Pleasanton Road to call her mother.[2] Complainant described Peaceful Lane as "very dark." As she was walking, a truck pulled alongside her and the male driver—later identified as Dotson—said she "looked like someone else." Complainant said she laughed and said "no, I'm not the person that he thought I was." Dotson then drove away, only to reverse back to her and ask if she needed a ride, to which she responded "no." Instead of driving away, Dotson asked again if she needed a ride, and the complainant told him "no, because I don't know if he's going to hurt me or if something would happen. And then he tried to tell me that nothing would happen, if he looked like that kind of person." Complainant eventually decided to accept the offer of a ride, threw her backpack into the back of Dotson's truck, and got into the truck on the front passenger side.

Complainant testified the convenience store was closed when they arrived, but Dotson told her he knew about another store. As they drove to the second store, Dotson asked complainant if she wanted any methamphetamine, and Dotson told her to remove the top from a flashlight from which she pulled a baggie containing a crystallized substance. Complainant said Dotson's mood

---

[1] Although Dotson does not challenge the sufficiency of the evidence on appeal, we set forth the factual background to the extent it provides a context for his issues on appeal.

[2] On cross-examination, complainant said she wanted to call Mike.

changed and he asked for either money or "sexual favors" to take her to the second store or to the house she shared with her roommates. Complainant refused, and the two continued to drive along Pleasanton Road until Dotson turned onto Neal Road, another rural road. Complainant stated Dotson then asked twice "Do you think I'm playing," and he pointed a small silver handgun at her face. Complainant said Dotson cocked the gun twice. Dotson eventually pulled the truck to the side of Neal Road, and told complainant to remove her pants and underwear. Dotson then exited the truck, still pointing the gun at her, and walked around to where complainant was sitting in the front seat.

The complainant said Dotson had her spread her legs, pulled her toward him, and vaginally raped her. He also sucked on one of her breasts. Complainant said she did not consent, she was scared, and she cried the entire time. Complainant said when Dotson was finished with her, he returned to his side of the truck and tried to start the truck. When the truck did not start because it had run out of gas, Dotson and complainant began to walk down Neal Road until they arrived at Pleasanton Road where they encountered a "hobo," and Dotson told her to follow the "hobo" and not him. Complainant said she then ran to a nearby house and asked the man who answered the door to call the police.

After the sheriff's deputies arrived, one of the deputies interviewed complainant and then took her back to the truck and to another location where Dotson was being detained for a field identification. Complainant was eventually taken to a hospital where she underwent a physical examination. Complainant testified she told the nurse her last sexual encounter had been about a month earlier, but she admitted she lied because she was embarrassed. At trial, complainant identified the gun as the one Dotson pointed at her and a baggie containing drugs as the one she saw in the truck.

On cross-examination, complainant said she arrived at her mother's house between 9:00 p.m. and 10:00 p.m. She also said she was surprised the convenience store was closed because it was only a little before 10:00 p.m.

After the complainant testified, several Bexar County Sheriff's deputies and detectives testified about their involvement after the assault was reported to the police. Deputy Amy Tamayo testified her patrol duties took her to the Pleasanton Road area where the assault occurred. She said she was familiar with a convenience store close to the intersection of Peaceful Lane and Pleasanton Road, and she thought it was usually closed by about 10:30 p.m. Deputy Tamayo was dispatched to the residence from which complainant's outcry call was made. Tamayo described the complainant as more excited than distraught. Deputy Tamayo, along with the complainant, left the house and located the truck on Neal Road, which Tamayo said was not lit by any lights and dead-ended at the gate to a ranch. When they arrived at the truck's location, other officers were already present. Deputy Tamayo stayed in her patrol car with the complainant until other deputies came to speak with her, at which point Tamayo went to look into the truck through the passenger side. She saw a clear plastic baggie containing a crystallized substance. Tamayo then drove to another location where Dotson was being held, while complainant rode with another deputy to the same location. Once complainant identified Dotson as the man who sexually assaulted her, Dotson was placed in custody and transported to the hospital for an examination, after which he was taken before a magistrate judge. On cross-examination, Deputy Tamayo stated complainant did not tell her the first convenience store was closed or that she and Dotson were going to a second convenience store. Tamayo also said complainant told her the first time she saw the handgun was when Dotson pulled onto Neal Road.

Deputy Joe Castellano testified next. He stated that, while on patrol, he received a dispatch for an aggravated sexual assault, which described what the suspect was wearing. While on patrol

Deputy Castellano saw an individual who matched the description at a gas station putting fuel into a red fuel can. In addition to fitting the description provided by dispatch, Deputy Castellano said he also noticed that the man—later identified as Dotson—"gave me this look, Like, Is he looking at me? Did he catch me[?] The same look that when you store an animal and you spotlight them and they stay looking at you[.]" Deputy Castellano said that Dotson quickly got into the back seat of a car, but he did not take the fuel can with him. As the vehicle started to drive away, Castellano blocked it with his patrol car. Castellano asked Dotson to exit the car, and placed Dotson in the back of his patrol car. On cross-examination, Deputy Castellano admitted he did not state in his written report, which he prepared on or near the date of the assault, that Dotson left behind the fuel can. Castellano admitted Dotson could have taken the fuel can with him, but later removed it from the car.

Deputy James Gillespie testified he also was on patrol when he was dispatched to the location of the gas station where Dotson was being detained by Deputy Castellano. After obtaining consent from the owner to search the car, Deputy Gillespie found a handgun under the rear seat floorboard. Gillespie said he saw the fuel can next to the car, which was about thirty yards from the gas pumps. Detective Teresa Christiansen testified she was called by Deputy Tamayo to the house from which complainant's outcry was made. Christiansen described complainant as "a little shaken up" and "in shock." Detective Christiansen later went to the location of the truck where she requested a crime scene investigator, and then she went to the location where Dotson was being detained. Complainant accompanied Detective Christiansen to this location and identified Dotson as the man who sexually assaulted her. According to Detective Christiansen, complainant was "shaking, screaming, very, very upset, [and] emotional" during the field identification. Detective Christiansen then returned to the location of the truck. Complainant told Christiansen that Dotson ejaculated on and near the truck, but Christiansen said no ejaculate was found.

Detective Rey Salinas, who was a crime scene investigator at the time, testified he went to the location of both the truck and the convenience store where Dotson was detained. Salinas photographed the complainant, the truck, and the scene where the truck was parked. Salinas also took custody of the handgun, which had live ammunition in the chamber. Detective Salinas also went to the hospital where he took photographs and custody of clothing taken from both complainant and Dotson. Salinas also stated no biological fluid was found at the scene of the truck, the grass was not crushed or "bedded down" and no tread marks from Dotson's boots were found on the ground in the area where Dotson would have stood outside the passenger door while he assaulted complainant.

The next witnesses to testify were the medical professionals and Bexar County forensic scientists. Emma Caballero testified she conducted the sexual assault nurse examination on the night complainant was taken to the hospital. Caballero said complainant told her that her last sexual encounter was one month before the assault. Kindra Clark, a registered nurse, testified she conducted the forensic examination of Dotson. Jamie Pomykal, a forensic scientist with the Bexar County Criminal Investigation Laboratory, tested the samples taken from both complainant and Dotson for foreign material. Catherine Haskins-Miller, also a forensic scientist with the Bexar County Criminal Investigation Laboratory, conducted the DNA testing on the samples on which Pomykal found foreign material. Miller testified the genetic profile of the sperm taken from complainant's vaginal swab was not consistent with Dotson's genetic profile; therefore, according to Miller, the sperm inside complainant belonged to another person. Miller said the unknown male's sperm was also found on the tip of Dotson's penis. Both Pomykal and Miller testified that sperm will stay inside someone's body for only about two to three days. Miller thought the sperm found in complainant's vagina probably had not been there longer than seventy-two hours. Dotson's sperm was not found inside complainant; however, complainant's genetic profile was

consistent with the female genetic profile found on the penile swab taken from Dotson. Miller testified the genetic profile of the saliva found on complainant's left breast was consistent with Dotson's genetic profile; therefore, Dotson was not excluded as the contributor of the saliva.

## INEFFECTIVE ASSISTANCE OF COUNSEL

After the jury found him guilty and the trial court assessed punishment, Dotson's trial counsel filed a motion for new trial and then withdrew. Dotson obtained new counsel, who represented him at the hearing on the motion for new trial. Immediately following the hearing, the trial court denied Dotson's motion for new trial. In his first and second issues on appeal, Dotson asserts his federal and state constitutional right to effective assistance of counsel was violated.

Because Dotson claimed ineffective assistance of counsel as part of his motion for new trial and he received a hearing on his motion, our ultimate task is to determine whether the trial court erred in denying that motion. *See Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012); *see also Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013) (citing to *Riley*). Accordingly, we consider his claim using the abuse of discretion standard of review applicable to denials of motions for new trial. *Riley*, 378 S.W.3d at 457. This standard requires us to show great deference to the trial court, reversing only if the trial court's decision was clearly erroneous and arbitrary. *Id.* An "appellate court must not substitute its own judgment for that of the trial court and must uphold the trial court's ruling if it is within the zone of reasonable disagreement." *Id.* As to determinations of fact, we must view the evidence in the light most favorable to the prior ruling: a trial court abuses its discretion only if no reasonable view of the evidence could support its holding. *Id.* at 457-58.

We review an appellant's claim of ineffective assistance of counsel under the well-established standard of review. *See Strickland v. Washington*, 466 U.S. 668, 690 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). The appellant must show (1) that

counsel's performance was deficient, i.e., counsel's assistance fell below an objective standard of reasonableness; and (2) prejudice, i.e., a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Thompson*, 9 S.W.3d at 812. The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance. *Scheanette v. State*, 144 S.W.3d 503, 509 (Tex. Crim. App. 2004); *Hawkins v. State*, 660 S.W.2d 65, 75 (Tex. Crim. App. 1983).

Generally, the trial record will not suffice to establish an ineffective assistance of counsel claim. *Thompson*, 9 S.W.3d at 813-14. However, in this case, the trial court conducted a hearing on Dotson's motion for new trial at which his trial counsel testified. Although counsel offered insight into his actions, an ineffective-assistance-of-counsel claim must be analyzed from the perspective of counsel at the time he acted and without the "deleterious effects of hindsight." *Id.* at 813. Nevertheless, we may evaluate the strategic and tactical considerations behind counsel's actions based on his testimony. *See Depena v. State*, 148 S.W.3d 461, 469 (Tex. App.—Corpus Christi-Edinburg 2004, no pet.) (testimony at new trial hearing "is one of the appropriate methods of developing an ineffective assistance of counsel claim for appellate review").

## A. Failure to Investigate

Dotson first asserts trial counsel was ineffective because he failed to interview the complainant, he did not investigate the alleged facts of the case that would have revealed inconsistencies in the complainant's testimony, and he did not interview potential witnesses.

Trial counsel has a duty to make an independent investigation into the facts of the case. *Walker v. State*, 195 S.W.3d 250, 255 (Tex. App.—San Antonio 2006, no pet.). "A natural consequence of this notion is that counsel has the responsibility to seek out and interview potential witnesses." *Diaz v. State*, 905 S.W.2d 302, 307 (Tex. App.—Corpus Christi 1995, no pet.). "That duty cannot be sloughed off to an investigator, nor may counsel rely exclusively upon either the

prosecutor's representations of the facts or the veracity of the defendant's version of the facts." *Id.* at 307-08. The independent investigation must be reasonable or reflect reasonable decisions that make particular investigations unnecessary. *See Strickland*, 466 U.S. at 691. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003).

To obtain relief on a failure to investigate claim, Dotson must show what evidence would have been obtained by the investigation and that it would have helped him. *See Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004) (to obtain relief on ineffective assistance claim based on failure to call a witness "applicant must show that [the witness] had been available to testify and that his testimony would have been of some benefit to the defense."); *Pinkston v. State*, 744 S.W.2d 329, 332 (Tex. App.—Houston [1st Dist.] 1988, no pet.) ("An attorney's failure to investigate or present witnesses will be a basis for establishing ineffective assistance of counsel only where it is shown that the witnesses would have been available and that the presentation of the evidence would have benefitted appellant.").

During the new trial hearing, Dotson said he and complainant took drugs together and the sex was consensual and "she wanted to have sex because she was mad at her boyfriend because he cheated on her."[3] Dotson also said he wanted to testify, but toward the end of trial he changed his mind because his attorney told him the State would "tear me up on the stand." Trial counsel also testified the defensive theory was that the sexual intercourse was consensual. On appeal, Dotson contends trial counsel should have investigated complainant's motive for the consensual intercourse, which, according to Dotson, was that complainant "was getting back at her boyfriend."

---

[3] In his brief on appeal, Dotson states he "had a defense—that he had consensual sex with complainant who had no interest in using the telephone at [the convenience store] but instead was having trouble with her boyfriend Mike."

In addition to complaining that counsel did not interview the complainant, Dotson also contends that if trial counsel had conducted an investigation, he would have discovered various inconsistencies in complainant's testimony regarding whether she walked rather than was driven by Mike to her mother's house on Peaceful Lane and whether the convenience store was actually open when Dotson and complainant drove up to the store. Finally, Dotson contends counsel should have interviewed Quentin Lewis, who was one of the men in the car when Dotson was detained. According to an affidavit filed by Dotson's father, Lewis would have testified that the fuel can was inside the car. At the new trial hearing, Dotson also stated he told counsel to interview Lewis, but he did not explain what information would have been gained from such an interview.

Michelle Hughes Woodward, an investigator retained by appellate counsel, also testified at the new trial hearing. Woodward testified that she spoke to the complainant who told her she walked from a friend's house to her mother's house, which Woodward estimated to be about a two hour walk. Woodward also said complainant told her that she had intercourse with Mike the day before the assault. The manager/cashier of the convenience store, Cathy Bridges, testified that on Tuesdays (the day of the assault) the store closes at 10:00 p.m. She stated that on the evening of the assault, various machines in the store were shut down at 9:58 p.m., 10:12 p.m., and 10:13 p.m. She said that after closing, lights on the canopy over the gas pumps are turned off, the outside lights around the store stay on, and half of the lights inside the store stay on. Although Bridges stated she was not subpoenaed to testify, she was not asked nor did she state she would have been available to testify if called at trial.

When asked why he did not request an investigator or visit the scene of the assault, trial counsel replied, "what were we going to find? I mean, seriously, it's been cold for 18 months."[4]

---

[4] The assault occurred on the evening of October 23, 2012 and trial commenced almost fifteen months later, on March 25, 2014.

However, counsel stated he acquired satellite maps of the area and asked Dotson to point out where everything was located. Counsel agreed he did not subpoena any witnesses, nor did he ask anyone in his office to interview the complainant or other witnesses. When asked why he did not mention consent at trial or question the complainant about whether she consented, counsel responded:

> Well, I didn't want her to repeat saying I was raped and raped again. Part of my strategy with her was that I didn't want to try to beat her up; otherwise, the jury would — I was afraid the jury would dislike me or dislike [Dotson] for trying to beat up a witness.
> . . .
> . . . Look, here's the things that scare me, okay, and that we're going to have 12 people [on the jury] over here look at you and say, Oh, you [the complainant] just met this guy and they just had sex just right then and there and that was it? And that was a big fear of mine. Like are 12 people just going to believe that?

When asked about his not interviewing Lewis, counsel said he and Dotson talked about what the other men in the car would say, but Dotson was adamant about testifying; therefore, counsel intended to bring certain evidence in through Dotson's testimony. Counsel stated he was worried that the other men's testimony might be inconsistent with Dotson's testimony and he was concerned about "any baggage that they bring along to the case."

We first note Dotson has not shown that either Bridges or Lewis would have been available to testify at trial. Further, Lewis did not submit an affidavit or testify at the new trial hearing. Because the only evidence about what Lewis may have said came from Dotson's father's affidavit and testimony, the trial court was within its right to disbelieve the assertions about whether Lewis should have been interviewed. *See Kober v. State*, 988 S.W.2d 230, 234 (Tex. Crim. App. 1999) (witness' unwillingness to support an affidavit with live testimony could itself be considered evidence that the affidavit is untrue).

We conclude counsel could have reasonably determined further investigation was unnecessary. Moreover, even if an error in trial strategy was made, it would constitute inadequate

representation only if counsel's actions were without any plausible basis. *See Wright v. State*, 223 S.W.3d 36, 43 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). That is not the case here. The record shows counsel made a considered decision not to "beat up on" the complainant by asking her whether sexual intercourse with Dotson was consensual or pressing her on minor inconsistencies in her testimony. As to these inconsistencies, whether the first convenience store was closed when Dotson and complainant arrived at the store shortly before 10:00 p.m. was brought into question by Deputy Tamayo's testimony that she was familiar with the store and it usually closed by 10:30 p.m. The evidence also showed the complainant lied about the last time she had sex. Thus, we cannot conclude counsel was defective for not investigating the case as Dotson believes he should have. *See Scheanette*, 144 S.W.3d at 509; *Hawkins*, 660 S.W.2d at 75.

**B.      Failure to Seek Expert Assistance and a Continuance**

Dotson next asserts trial counsel was ineffective because he did not consult a DNA expert to verify the analysis conducted by the State's experts, counsel did not request a pharmacologist to evaluate his claims about the complainant's drug-use symptoms, and counsel did not request a continuance even though counsel was appointed only three months before trial commenced. At the new trial hearing, Dotson claimed he told counsel that he and complainant took drugs together and then had consensual sex. Dotson's sister speculated, during her testimony at the new trial hearing, that if someone had given her brother and complainant a drug test, "they would have noticed, okay, maybe she is jumpy because she was just doing meth . . . ." However, Dotson fails to explain how consulting a DNA expert or a pharmacologist could have aided him given his defensive theory that he had consensual sexual intercourse with the complainant, and given the fact that there was no testimony at trial that he or complainant took any drugs.

When counsel was asked to explain his strategy for not retaining an expert, counsel replied as follows:

. . . The strategy was consent.  There was medical evidence that he did have sex with her.  There was DNA that wasn't his, that was somebody else['s], that was on him and on her.
. . .
So that showed somebody else's.  So that went along with our defense that it was somebody else, that she just got upset, that he didn't do it, that it was just consent.
. . .
So we didn't really have a problem — it's not like they found her — his ejaculate.  In fact, they didn't find his ejaculate in her or on the ground where she said it was.
. . .
So it kind of — it kind of fell in line with our defense.

Counsel also stated he believed the DNA evidence presented by the State helped the defensive theory that the sex was consensual because it demonstrated the complainant lied about the date of her last sexual encounter.  When asked why he did not request a continuance, counsel responded that he and Dotson discussed a continuance, but Dotson wanted to go to trial and he [counsel] felt comfortable going forward because they had "a pretty good defensive theory" and Dotson was "pretty consistent throughout . . . what he was saying."

An attorney's failure to call a medical expert is irrelevant absent a showing that an expert witness was available to testify on a particular issue and the expert's testimony would have benefitted the appellant.  *See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) (defendant complained counsel was ineffective because no witness testified on his behalf); *Brown v. State*, 334 S.W.3d 789, 803 (Tex. App.—Tyler 2010, pet. ref'd) ("[T]he failure to request the appointment of an expert witness is not ineffective assistance in the absence of a showing that the expert would have testified in a manner that benefitted the defendant."); *Cate v. State*, 124 S.W.3d 922, 927 (Tex. App.—Amarillo 2004, pet. ref'd) (same).  Nothing in the record here indicates an expert had been contacted and was willing to testify or what the expert's testimony would have been.  Therefore, we conclude Dotson has not satisfied his burden to show how any expert testimony would have helped him.  Further, the record reveals counsel had a plausible basis for

relying on the State's DNA evidence because he believed the evidence was consistent with their defensive theory of consensual sex.

## C.    Fingerprint Evidence and Admission of Handgun Into Evidence

Next, Dotson asserts counsel was ineffective because he did not object to the admission of the handgun when the State offered it into evidence and counsel did not question any witness about the presence of fingerprints on the weapon. Dotson contends the issue of fingerprints was crucial because, in part, the jury sent out a note during deliberations asking: (1) "How do we establish ownership/possession of the firearm" and (2) "were Jason Dotson's fingerprints found on the firearm?"[5]

At the new trial hearing, Dotson testified counsel told him he would not move to suppress the gun because complainant said Dotson had the gun and the gun was found in the car. Dotson also denied telling counsel that the gun was his. Counsel testified Dotson told him the weapon was his and, because Dotson intended to talk about the gun when he testified, counsel did not want Dotson to perjure himself. When confronted with Dotson's testimony that he did not admit to owning the gun, counsel said he was "shocked" because Dotson told him where the gun was located in the truck and that he pulled it from a vent in the truck and put it in his pocket, and he told counsel he put the gun under the seat in the car where it was later found by the deputy. Counsel said he did not ask for fingerprint information because he was afraid the evidence would show the gun belonged to Dotson. Counsel said he did not file a motion to suppress the handgun because, in part, he believed Dotson would testify and might perjure himself by denying ownership of the gun, and, in counsel's opinion, the complainant did a very good job of describing the gun Dotson pointed at her.

---

[5] The trial court responded to these questions by informing the jury it had all the law and the court's charge and all the evidence, and the jurors should continue with their deliberations.

On this record, we conclude Dotson did not satisfy his burden of showing that trial counsel's performance fell below an objective standard of reasonableness.

### D.      Failure to Request Lesser-Included Offense

Finally, Dotson asserts counsel was ineffective because he did not request an instruction on the lesser-included offense of sexual assault.  A defendant is entitled to a lesser-included-offense instruction (1) if the lesser-included offense's elements are included within the proof necessary to establish the charged offense's elements, and (2) if the record includes evidence that could allow a rational jury to find the defendant guilty of only the lesser-included offense. *State v. Meru*, 414 S.W.3d 159, 161-62 (Tex. Crim. App. 2013); *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex. Crim. App. 2007).  To satisfy the second requirement, a defendant need only show "[a]nything more than a scintilla of evidence" to support the lesser-included offense. *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994).  However, merely undermining the charged offense is not enough; the defendant must substantiate the requested lesser-included offense with at least some evidentiary support. *See Schweinle v. State*, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996).  "[T]he evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense." *Hall*, 225 S.W.3d at 536.

In this case, there is no evidence that would support a lesser-included offense.  Although the handgun was not found in or near Dotson's truck, the complainant provided a detailed description of the handgun Dotson pointed at her, and her description matched the handgun found in the car under Dotson's seat.  Because we conclude Dotson was not entitled to a lesser-included offense instruction, trial counsel was not ineffective for not requesting one.

### E.      Totality of the Circumstances

Dotson also asserts that counsel's performance as a whole cumulatively undermined the outcome of the trial.  Dotson relies on *Ex parte Welborn*, 785 S.W.2d 391 (Tex. Crim. App. 1990),

a habeas corpus proceeding, in which trial counsel gave detailed testimony about the reasons for his conduct in representing the defendant at trial. *Id.* at 392-93. In light of counsel's testimony, the *Welborn* court concluded the numerous deficiencies in representation were not part of a trial strategy; rather, they were the result of inexperience, lack of familiarity with the State's case, and failure to interview any of the State's witnesses. *Id.* at 396.

Here, unlike in *Welborn*, the record reveals counsel understood the prosecution's theory and made certain strategic decisions based upon the defensive theory that sexual intercourse with the complainant was consensual and based upon his desire to not have Dotson perjure himself if he testified.

## F.     Conclusion

Because a "reasonable view of the record could support the trial court's ruling," *Riley*, 378 S.W.3d at 457, we cannot say the court abused its discretion in denying Dotson's motion for new trial. *See id.*

### WITNESS TESTIMONY UNDER RULE 612

During trial, the State asked Detective Salinas if he wrote a report of his investigation of the crime scene, and he responded that he did. On cross-examination, Detective Salinas was asked whether he had any other notes because counsel had "notice[d] that on the roll of film that there was a — notes that you had written on there." Salinas explained his report was the only hard copy because it was standard procedure that everything—in this case certain hand-written notes—be destroyed once a report is written. Counsel then asked that all of Detective Salinas' testimony be stricken pursuant to Texas Rule of Evidence 612. The trial court denied his request. In his final issue on appeal, Dotson asserts the trial court erred by not striking the testimony of Detective Salinas pursuant to Rule 612, which provides as follows:

(a) Scope. This rule gives an adverse party certain options when a witness uses a writing to refresh memory:

> (1) while testifying;
> (2) before testifying, in civil cases, if the court decides that justice requires the party to have those options; or
> (3) before testifying, in criminal cases.

(b) Adverse Party's Options; Deleting Unrelated Matter. An adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony. If the producing party claims that the writing includes unrelated matter, the court must examine the writing in camera, delete any unrelated portion, and order that the rest be delivered to the adverse party. Any portion deleted over objection must be preserved for the record.

(c) Failure to Produce or Deliver the Writing. If a writing is not produced or is not delivered as ordered, the court may issue any appropriate order. But if the prosecution does not comply in a criminal case, the court must strike the witness's testimony or--if justice so requires--declare a mistrial.

Tex. R. Evid. 612.

At trial, defense counsel asked Detective Salinas as follows:

Q. All right. Let's talk about the notes that you did make. Where did you write those notes?
A. If I do write the notes, I usually put it on the —
Q. Well, didn't you say you made notes?
A. If I did. That's what I just said. If I did take notes, it would be on the incident case file, which is usually destroyed afterwards.
Q. Okay. It's a little pad of paper with notes on it?
A. The pad of paper belonged to the patrolman.
Q. It did not belong to you?
A. (Moving head side to side)
Q. Which patrolman?
A. It was either David Ott or Joe Castellano.
Q. Can we take a — can we pull that up? I don't have that, but it — if you look at it, that is not your notes?
A. No. I usually take photographs of the patrolman's notes so I can refer to them when I'm making my reports. Just it's a lot simpler that way.
Q. Okay. And you said you've made notes and you try to transport it from those notes to here, right? Those — if you made notes, you said if you made notes.
A. They wouldn't make it here. They would be destroyed after the initial report's done.  That's how we do our reports.
Q. And you take these notes in order to help you here [sic] testify today, right?
A. That's what the report's for.

Q. Okay. That's what the report — but you take the notes for the report for today, right?
A. If they were taken, they're no longer here, sir.
Q. Okay. All I want you to do is listen to my question, okay? If you take notes down, your notes help you with your report which helps you today, right?
A. They help me write the report, yes.
Q. And the report is used to help you on — testify today, right?
A. Yes, sir.
Q. And you don't have any notes today. You can't bring any notes with you. You said they're destroyed.
A. I brought my report and I can remember the case just fine.
Q. Okay. I — just that's not the issue, not at issue. Were there notes taken for this case?
A. If there were, they're destroyed.
Q. Earlier did you testify you did do it or not when I first asked you if you had any other notes?
A. You asked if I used a note pad. I said I did not.
Q. So we don't know whether you used notes or not.
A. Most of the time I do photographs.
Q. Okay. So you used Officer Castellano's to help you with this case today, those notes there, right?
A. Possibly. I don't remember which patrolman had the notes.
Q. Okay. But who — but you took — you looked at those notes to help you today, right?
A. I took the photograph of the notes, yes.

The State then asked Salinas to confirm that every paragraph in his report began with the word "I," everything he wrote in the report was in conjunction with what he did personally, that the report indicated all the actions he took at each crime scene, and the report was the only thing he used to refresh his memory. The State then asked:

Q. Do you have any independent recollection of whether or not you took any notes in this particular case?
A. If I do — if I did, they would be at a case file at the office in the crime scene unit, but most of the time we were told to — once we make a hard copy, we destroy the notes.
Q. And if you made — okay. But you don't know in this case?
. . .
A. Don't know.
Q. [Did you review any notes] for your testimony here today, any notes that you may have made? You said you don't — I mean, if you don't remember you made any —
A. No.
Q. — you didn't review any for your testimony, did you?

- 18 -

A. No. No notes.

Q. Okay. And in your practice in situations where you do make notes, do you then transcribe that information that are [sic] in your notes into a report?

A. Yes, ma'am.

Q. Do you make an effort to memorialize everything that you have taken a note of?

A. Depending on the case, yes, ma'am. If it's a homicide, we save everything.

Q. Okay. But regardless, anything that you would have ever made a note on would have been memorialized in a report?

A. In the report. Yes, ma'am.

Defense counsel then asked:

Q. You took a picture – in the roll of photos there's a picture of a note pad, right?

A. Yes, sir.

Q. On there were some notes about this case, right?

A. Where is the photo?

. . .

After viewing the photographs he had taken, the State asked the following:

Q. Okay. So with certainty, can you tell this Court whether or not you took any personal notes in this particular case?

A. Not in this case, no.

Q. Okay. And then did you look at the photo — outside of the Court's presence [sic] action, did you look at the photo of a note pad at the defense [sic] request?

A. Yes.

Q. Okay. Had you looked at that photo before to help refresh your memory for testifying here in the courtroom today?

A. No, ma'am.

Q. Okay. And was that even — was that your note pad [in the photo]?

A. No, ma'am.

. . .

Detective Salinas was shown a photograph he took of a note pad on which was written "Gun cocked twice." Salinas stated he took the photograph but the note pad was not his, and he did not know what happened to the note pad after he photographed it. He was then asked:

Q. But you took that picture?

A. Yes, sir.

Q. On there it references facts about today. You took that picture to help you for today, right?

A. I took it to write the report.

On appeal, the State argues Rule 612 was not implicated because Salinas testified he did not use any notes, other than his own report, to refresh his memory. Dotson counters it is irrelevant that Salinas' report was the only thing he used to refresh his memory because his report contained information from notes that were destroyed. We agree with the State. Rule 612 is implicated only "when a witness uses a writing to refresh [his or her] memory." Tex. R. Evid. 612. In this case, the only "writing" Detective Salinas used to refresh his memory was his written report, which was provided to Dotson's attorney. We do not construe Rule 612 as applying to other documents that may have been used to create the "writing," and we will not add language to the rule requiring the production of underlying documents.

## CONCLUSION

For the reasons stated above, we overrule Dotson's issues on appeal and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do not publish